**SARAH, Keeli, Ivy, Sheba, Darrell, Harper, Emma, Rain, Ulysses, Henry Melvyn Richardson, Stephany Harris, and Klaree Boose, Appellants,**

v.

**PRIMARILY PRIMATES, INC., Appellee.**

No. 04–06–00868–CV.

Court of Appeals of Texas, San Antonio.

Jan. 16, 2008.

Rehearing Overruled Feb. 13 and April 10, 2008.

patory material or other evidence favorable to his defense.

People for the Ethical Treatment of Animals, Norfolk, VA, for appellants.

Emily Frost, McGinnis, Lochridge & Kilgore, Austin, Beth Watkins Squires, Law Office of Beth Squires, Oscar C. Gonzalez, Law Offices of Oscar C. Gonzalez, Inc., Eric R. Turton, Law Office of Eric R. Turton, San Antonio, TX, for appellee.

Sitting: CATHERINE STONE, Justice, KAREN ANGELINI, Justice, REBECCA SIMMONS, Justice.

## OPINION

Opinion By KAREN ANGELINI, Justice.

Appellants appeal from the trial court's order dismissing their case for lack of standing. On appeal, they argue that (1) an agreed order between them and Appellee Primarily Primates, Inc. entered into during the pendency of the underlying lawsuit gave them standing, and (2) they have standing pursuant to section 112.037 of the Texas Trust Code, which allows the creation of trusts to provide for the care of animals. We affirm the trial court's order dismissing the case for lack of standing.

### BACKGROUND

In January 2006, Primarily Primates, Inc. ("PPI") and Ohio State University[1] entered into an agreement whereby Ohio State "transfer[ed] nine chimpanzees and three new world monkeys utilized in research at its Chimpanzee Center ('the Chimps and Monkeys')" to PPI, and PPI in turn agreed "to accept ownership of the Chimps and Monkeys and to provide for their lifetime care." The agreement lists the following as PPI's responsibilities:

Thomas H. Crofts, Jr., Crofts & Callaway, P.C., Lisa A. Vance, Vance & Sailors, P.C., San Antonio, TX, Leana E. Stormont,

1. Ohio State University was not a party in the underlying lawsuit and is not a party in this appeal.

(1) PPI agrees to accept ownership of the Chimps and Monkeys and to provide for their lifetime care in a humane environment that complies with all relevant state and federal regulations. PPI will not breed the Chimps and Monkeys, will not use them in research projects of any kind, and will not euthanize any of them except for humane reasons relating to a health condition.

(2) PPI will construct facilities for the housing of the Chimps and Monkeys in accordance with the specifications set forth in Attachment A.

(3) PPI will provide personnel and other assistance in connection with the shipment of the Chimps and Monkeys to PPI, in accordance with the Shipment Schedule set forth in Attachment B. The Parties will mutually agree on a shipping date.

(4) PPI will construct a temporary enclosure to house the Chimps and Monkeys pending completion of a permanent facility. PPI acknowledges receipt of $14,944.00 from Ohio State to cover the cost of constructing the temporary enclosure.

The agreement also lists the following as Ohio State's responsibilities:

(1) Ohio State will pay facility construction costs in the total amount of $236,483.00 as set forth in Attachment A. This amount will be paid upon execution of this Agreement.

(2) Ohio State will provide personnel and other assistance in connection with the shipment of the Chimps and Monkeys to PPI, and will pay the shipping costs in accordance with the Shipping Schedule set forth in Attachment B.

(3) Ohio State will provide an endowment to PPI in the amount of $8,000 per chimpanzee for a total of $72,000. A check for this amount, payable to Primarily Primates, Inc. will be delivered no later than 60 days after the Point of Transfer. Ohio State is not required to pay an endowment for the New World Monkeys.

The agreement, under a section titled "Ownership," also discusses that Ohio State "warrants that it is the owner of all rights, title and interest in the Chimps and Monkeys" and "transfers all rights, title and interest in the Chimps and Monkeys to PPI." In return, PPI "agrees to accept such transfer" effective at the "Point of Transfer." Further, according to the agreement, if "a lawsuit is initiated against Ohio State or PPI after the Point of Transfer challenging Ohio State's ownership," "its authority to transfer ownership," or "the validity of the ownership rights conveyed to PPI under this Agreement," then ownership of the Chimps and Monkeys will revert to Ohio State, but Ohio State will be responsible for all legal fees.

The agreement also provides that it "shall be governed by and construed in accordance with the laws of the State of Ohio" and that "[e]ither party may, at any time, and for any reason, terminate this Agreement by giving 7 days written notice to the other party."

In February of 2006, the primates were shipped from Ohio to PPI's facilities in Texas. Shortly after their arrival, two of them died, and a third escaped from a cage.

On April 27, 2006, attorneys purporting to act on behalf of "Sarah, Harper, Emma, Keeli, Ivy, Sheba, Darrell, Rain, and Ulysses" (the surviving primates) filed suit against PPI, alleging breach of contract. In the alternative, they brought a declaratory judgment action, asking the trial court to declare that "the contract [between PPI and Ohio State] is void because it violates Texas law." They also sought "removal from PPI and transfer to an

appropriate sanctuary that will provide them with appropriate care as is described in the contract." Additionally, "[i]n the alternative, and in the unlikely event that the court does not order specific performance," they requested the "creation" of a trust and "an award of damages in the amount of $236,483.00 (the full contract price) to be held in trust and applied towards the acquisition of shelter and care at a suitable facility." They attached a copy of the contract to their petition.

On May 4, 2006, they filed a "Second Amended Original Petition," adding Henry Melvyn Richardson, Stephany Harris, and Klaree Boose, "people interested in Plaintiffs' welfare," as plaintiffs. This amended petition retained the same claims as the original one: breach of contract, declaratory judgment, and "recognition" (instead of "creation") of a trust.

In response to the lawsuit, PPI filed a motion to dismiss for lack of standing. After several hearings, the trial court dismissed the case for lack of standing. "Sarah, Harper, Emma, Keeli, Ivy, Sheba, Darrell, Rain, and Ulysses" (the surviving primates), along with Henry Melvyn Richardson, Stephany Harris, and Klaree Boose (the interested persons), filed a notice of appeal, seeking review of the trial court's order.[2]

## DISCUSSION

A. *Did the agreed order to appoint a master in chancery give appellants standing?*

Richardson, Harris, and Boose ("appellants") argue that even if they did not initially have standing, they gained stand-

ing when PPI agreed to the order appointing a master in chancery. We disagree.

1. *Procedural History of Agreed Order*

Shortly after appellants filed their original petition, the trial court held a hearing on their application for a temporary restraining order and on PPI's motion to dismiss. After the hearing, the trial court ordered an "independent neutral inspection" of PPI's facilities and appointed Todd R. Bowsher, curator of mammals at the Dallas Zoo, to conduct the inspection as soon as possible. After Bowsher completed his inspection, the trial court held another hearing on appellants' application for a temporary restraining order and on PPI's amended motion to dismiss. At that hearing, PPI requested that the trial court hear its motion to dismiss before considering appellants' application for a temporary retraining order. The trial court, however, decided to hear evidence relating to the temporary restraining order before deciding the motion to dismiss. Thus, in support of their request for a temporary restraining order, appellants elicited testimony from Dr. Bowsher and Klaree Boose, one of the "interested persons" named as a plaintiff. Although Dr. Bowsher testified that the primates at issue in this case were not in imminent danger, he did testify that he had concerns about their well-being. Klaree Boose then testified that she was a facilities manager at Ohio State's Chimp Center and helped prepare the primates for transfer to PPI. She admitted, however, that she does not represent Ohio State. Appellants then introduced a copy of the contract between Ohio State and PPI into evidence.

PPI then argued its motion to dismiss, emphasizing that the primates do not have

---

**2.** Although the notice of appeal states that, in addition to Richardson, Harris, and Boose, the surviving primates are seeking review of the trial court's order, no one argues on appeal that the surviving primates have standing. Thus, on appeal, we are considering only whether Richardson, Harris, and Boose, have standing.

capacity to sue and that the "interested persons" do not have standing to sue. At the end of the hearing, from the bench, the trial court orally denied the motion to dismiss and the request for a temporary restraining order; however, it did find that the contract created a trust and appointed Charles Jackson as inter vivos trustee "to oversee compliance with the provisions of this trust agreement and/or contract, as indicated by the exhibit, contractual provisions with Ohio State until further order of the court."

At a hearing three weeks later, Charles Jackson appeared and requested that he be appointed as master in chancery instead of as trustee. At the end of the hearing, the trial court signed an "Agreed Order Governing Appointment of Master in Chancery." This is the agreed order that appellants claim give them standing.

The pertinent parts of the agreed order state the following:

> On the 14th day of July 2006, came on to be heard the agreement of the parties regarding the appointment of a Master in Chancery in this cause of action pursuant to Rule 171 of the Texas Rules of Civil Procedure. The parties announced that they have reached an agreement to modify the ruling of the Court, subject to the approval of the Court, and have asked the Court to appoint Charles H. Jackson, III[as] Master in Chancery.
>
> The Court, having reviewed the pleadings and the agreement of counsel is of the opinion that the appointment of a Master in Chancery is appropriate in this case.... Charles H. Jackson, III is hereby directed to perform all the duties required of him by the Court and shall be under orders of the court and have such powers as the Master of Chancery has in a court of equity.
>
> The Court hereby orders that Charles H. Jackson, III, as Master in Chancery has and shall exercise the power to do all acts and take all measures necessary or proper for the efficient performance of his duties under this order. As such, Charles H. Jackson, III shall have the following powers *until further expanded or limited by court order* and the parties are hereby ordered to fully and completely cooperate with Charles H. Jackson, III as Master in Chancery in this case, in that the Court hereby orders that Charles H. Jackson, III shall and does: ...
>
> 6. have full and complete authority to take such action as is necessary to ensure the contractual provisions of the contract between Ohio State University and Primarily Primates, Inc. are complied with, including those terms relat[ing] to the health, safety, and welfare of the chimpanzees and monkeys who are the subject of the contract;
>
> 7. provide recommendations to the Court regarding any and all emergency relief necessary, if any, to maintain the health, safety, and welfare of the chimpanzees and monkeys who are the subject of the contract; and
>
> 8. provide all reports to the Court as the Court may request....

(emphasis added).

A month later, the master filed a report with the trial court, recommending that the primates be transferred to Chimp Haven, a sanctuary located in Louisiana. PPI objected to the master's recommendations and re-urged its motion to dismiss. The trial court then held a hearing on PPI's motion for reconsideration of its first amended motion to dismiss for lack of standing and on whether to adopt the master's recommendations. At the beginning of the hearing, because the parties indicated that they were close to settling, the

trial court allowed them to confer. For three hours, they negotiated; they then reported to the trial court that they were close to settling. However, PPI's counsel explained that before PPI could settle the dispute, he needed approval from PPI's board, which was scheduled to meet on September 6, 2006. Thus, the trial court agreed to wait until September 7, 2006, to rule on the pending motions.

On September 8, 2006, the trial court signed an order granting PPI's motion for reconsideration, granting PPI's first amended motion to dismiss, and dismissing the cause for lack of standing.

### 2. Analysis

Appellants contend that even if they did not initially have standing, they gained standing when PPI agreed to the order appointing Charles Jackson as master in chancery and giving him the power "to oversee compliance with the provisions of this trust agreement" and "to ensure that the terms of the above agreement between [PPI and Ohio State] are complied with." Because PPI agreed to the order, appellants argue that they gained a right to enforce the terms of the agreed order. According to appellants, "a master appointed by consent has whatever powers and duties the parties agree to confer, and the court has the ministerial duty to effectuate the agreement." Thus, they argue that the trial court erred in dismissing the case and should have instead enforced the agreed order.

For support, appellants cite *San Benito Cameron County Drainage District v. Farmers' State Guaranty Bank*, 192 S.W. 1145, 1147 (Tex.Civ.App.-San Antonio 1917, writ ref'd), which states that an appellant, "having agreed in open court to the appointment [of a master in chancery], together with all the conditions appended thereto, is bound by such conditions as it would be in any other fair contract." They

also cite *Trevino v. Houston Orthopedic Center*, 831 S.W.2d 341, 344 (Tex.App.-Houston [14th Dist.] 1992, writ denied), which states that once the parties have entered into an agreement under Texas Rule of Civil Procedure 11, a trial court "has the ministerial duty to render judgment in strict accordance with the parties' agreement."

Appellants then argue that even if PPI's motion for reconsideration of its motion to dismiss is considered a withdrawal of its consent to the agreed order, "PPI's reneging could not eliminate plaintiffs' right to obtain enforcement of the agreement under" Texas Rule of Civil Procedure 11.

In response, PPI argues the following: (1) standing is a jurisdictional requirement and cannot be waived; (2) even if standing could be waived, here, PPI preserved error for appeal by timely filing a motion to dismiss for lack of standing and obtaining a ruling from the trial court (which first denied the motion and then later, on reconsideration, granted it); and (3) even if the agreed order is considered a contract between PPI and appellants, appellants never alleged such a cause of action in the underlying lawsuit.

■ First, standing is an element of subject-matter jurisdiction that can be raised at any time. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex.1993). Thus, a party cannot waive standing. *See id.* Second, PPI preserved this issue for appeal by timely filing a motion to dismiss and obtaining a ruling from the trial court. *See* TEX.R.APP. P. 33.1. Third, and more importantly, the agreed order does not confer standing upon appellants.

■ The agreed order states that the master in chancery was appointed pursuant to Texas Rule of Civil Procedure 171;

the order then tracks the language of Rule 171. Rule 171 provides the following:

### Master in Chancery

The court may, in exceptional cases, for good cause appoint a master in chancery, who shall be a citizen of this State, and not an attorney for either party to the action, nor related to either party, who shall perform all of the duties required of him by the court, and shall be under orders of the court, and have such power as the master of chancery has in a court of equity.

The order of reference to the master may specify or limit his powers, and may direct him to report only upon particular issues, or to do or perform particular acts, or to receive and report evidence only and may fix the time and place for beginning and closing the hearings, and for the filing of the master's report. Subject to the limitations and specifications stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties under the order. He may require the production before him of evidence upon all matters embraced in the reference, including the production of books, papers, vouchers, documents and other writings applicable thereto. He may rule upon the admissibility of evidence, unless otherwise directed by the order of reference and has the authority to put witnesses on oath, and may, himself, examine them, and may call the parties to the action and examine them upon oath. When a party so requests, the master shall make a record of the evidence offered and excluded in the same manner as provided for a court sitting in the trial of a case.

The clerk of the court shall forthwith furnish and master with a copy of the order of reference.

The parties may procure the attendance of witnesses before the master by the issuance and service of process as provided by law and these rules.

The court may confirm, modify, correct, reject, reverse or recommit the report, after it is filed, as the court may deem proper and necessary in the particular circumstances of the case. The court shall award reasonable compensation to such master to be taxed as costs of suit.

Tex.R. Civ. P. 171.

■ In support of their argument that the agreed order constituted a Rule 11 agreement, appellants focus on section six of the agreed order, which states that the master shall "have full and complete authority to take such action as is necessary to ensure the contractual provisions of the contract between Ohio State University and Primarily Primates, Inc. are complied with." However, appellants ignore the introductory language of this section, which states that the master in chancery "*shall have the following powers until further expanded or limited by Court order.*" (emphasis added). While we agree with appellants that parties can modify the authority of a trial court to act upon a master's recommendations, *see Young v. Young,* 854 S.W.2d 698, 701 (Tex.App.-Dallas 1993, writ denied), here, the agreed order explicitly states that the trial court is retaining authority over the master. Thus, PPI was not agreeing to have the master in chancery resolve the parties' dispute; it was agreeing only to the appointment of the master, who would then report to the trial court, which would then either accept or reject the master's recommendations under Rule 171. *See id.* (holding that where appointment of master in chancery was made pursuant to

Rule 171, "[t]he fact that the parties agreed to the appointment and deviated from the language of Rule 171 in two minor respects does not mean that interpretative decisions of Rule 171 are inapplicable"; thus, "Rule 171 case law is relevant except to the extent the terms of the agreed order differ from the specific language of the rule").

This interpretation is supported by the procedural history of this case. After being appointed master in chancery, Jackson prepared his recommendations and filed them with the trial court. PPI then objected to the recommendations, and the trial court held a hearing on whether to accept or reject the master's recommendations and on whether to reconsider PPI's motion to dismiss for lack of standing.

Finally, appellants argue that PPI is estopped from evading the parties' agreed order. According to appellants, a party is estopped from evading an order that it invited by agreement. They argue that "[b]y virtue of the agreement, PPI invoked the jurisdiction of the trial court and was thereby estopped from raising jurisdictional arguments because its conduct in entering into the agreed order was inconsistent with a claim of lack of jurisdiction." We, however, have held that PPI did not invite such an agreed order that would be inconsistent with its claim that the court lacked jurisdiction.

We, therefore, hold that the agreed order to appoint a master in chancery did not confer standing upon appellants.

B. *Do appellants have standing pursuant to section 112.037 of the Texas Trust Code?*

■ A party must have standing to bring a lawsuit. *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex.2001). "Standing" is a party's justiciable interest in the suit.

*Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661–62 (Tex. 1996). The test for standing requires that there be a real controversy between the parties that will actually be determined by the judicial declaration sought. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex.2005). A plaintiff has standing when it is personally aggrieved, regardless of whether it is acting with legal authority. *Nootsie*, 925 S.W.2d at 661. If a party lacks standing, a trial court lacks subject-matter jurisdiction to hear the case. *Lovato*, 171 S.W.3d at 849. Thus, standing cannot be waived and can be raised for the first time on appeal. *Id.* And, whether a court has subject-matter jurisdiction is a question of law. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004).

*1. Do we look to the petition or to the contract?*

■ According to appellants, they have standing because their petition alleged sufficient facts by requesting that the trial court recognize the existence of a trust created for the care of the primates pursuant to section 112.037 of the Texas Trust Code. *See* TEX. PROP.CODE ANN. § 112.037(a) (Vernon 2007) ("A trust may be created to provide for the care of an animal alive during the settlor's lifetime."). Subsection 112.037(b) allows "[a] person having an interest in the welfare of an animal that is the subject of a trust authorized by this section [to] request the court to appoint a person to enforce the trust or to remove a person appointed to enforce the trust." *Id.* § 112.037(b). According to Plaintiffs, their petition sufficiently alleged that Dr. Mel Richardson, Stephany Harris, and Klaree Boose were such "interested persons."

In response, PPI argues the following: (1) animals lack standing to bring suit

under any applicable law; thus, the primates had no standing to bring the petition;[3] and (2) Richardson, Harris, and Boose have no justiciable interest in this lawsuit. According to PPI, Richardson, Harris, and Boose were not parties to the contract between PPI and Ohio State; they do not claim to be third-party beneficiaries to the contract; and they do not claim ownership rights to the primates. PPI also argues that the trial court could not hold that the contract between PPI and Ohio State created a trust to provide for the care of the primates pursuant to section 112.037 of the Texas Trust Code because the contract provided that it would be construed in accordance with Ohio law, and at the time the parties entered into the contract, Ohio law did not permit the creation of a trust to provide for the care of an animal.

In their reply brief, appellants argue that we should not consider the contract between PPI and Ohio State, but should instead look solely to their petition and take all the allegations in the petition as true. We disagree.

■■■■ Generally, a trial court looks to the allegations of a plaintiff's petition to determine standing. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004) (explaining that whether a pleader has alleged facts that affirmatively demonstrate a trial court's subject-matter jurisdiction is a question of law reviewed de novo); *see id.* (explaining that whether undisputed evidence of jurisdictional facts establishes a trial court's juris-

diction is also a question of law). Thus, when a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Id.* If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded an opportunity to amend. *Id.* at 226–27.

■■■■ However, under certain circumstances, when deciding a jurisdictional challenge, a trial court may go beyond the allegations in the pleadings and consider evidence.[4] *Id.* For example, if a plea to jurisdiction challenges the existence of jurisdictional facts and those facts are necessary to resolve the jurisdictional issue, the trial court is required to consider relevant evidence submitted by the parties. *Id.* at 227. Thus, when the consideration of a trial court's subject-matter jurisdiction requires the examination of evidence, the trial court exercises its discretion in deciding whether the jurisdictional determination should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable. *Id.* Then, in such a case in which the jurisdictional challenge implicates the merits of a plaintiff's cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. *Id.* If the evidence creates a fact issue regarding the

---

**3.** Appellants do not appear to dispute this fact as they focus their arguments on the contract creating a trust to provide for the benefit of the primates.

**4.** Appellants admit this in their opening brief when they state that "[i]n deciding a motion to dismiss for want of jurisdiction the court is not limited to the pleadings alone and 'may

consider evidence and must do so when necessary to resolve jurisdictional issues, but the court should confine itself to the evidence relevant to the jurisdictional issue.' *Dillard Tex. Operating Ltd. P'ship v. City of Mesquite*, 168 S.W.3d 211, 214 (Tex.App.-Dallas 2005, pet. denied)."

jurisdictional question, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. *Id.* at 227–28. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

Here, at the hearing on the motion to dismiss, appellants' own trial counsel entered the contract between PPI and Ohio State in evidence. Thus, the contract is undisputed evidence that the court considered in deciding the motion, and, because we consider it to be necessary to resolve the jurisdictional issue, we will consider it on appeal. *See id.* at 227.

*2. Did the contract between PPI and Ohio State create a trust to provide for the care of the primates?*

The contract between PPI and Ohio State clearly states that it will be governed by Ohio law: "This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio." PPI argues that because Ohio law did not recognize the creation of a trust to provide for the care of an animal at the time PPI and Ohio State entered into the contract, the contract cannot be construed as creating a trust. In response, appellants argue that "PPI's choice of law theory . . . is a matter of affirmative defense, which has no impact on subject matter jurisdiction," and that PPI waived this affirmative defense by failing to plead it. Thus, they argue that we must look to Texas law in considering whether the contract created a trust to provide for the care of the primates. Because we hold that the contract did not

create a trust under Texas law, we need not decide whether Ohio law should apply.

■ Section 112.037 of the Texas Trust Code allows a trust to "be created to provide for the care of an animal alive during the settlor's lifetime." TEX. PROP. CODE ANN. § 112.037(a) (Vernon 2007). Such a trust terminates on the death of the animal and may be enforced by a person appointed in the terms of the trust or, if a person is not appointed, by a person appointed by the court. *See id.* § 112.037(a)-(b).[5] However, although section 112.037 allows the creation of a trust to provide for the care of an animal, that does not necessarily mean that every contract relating to animals creates such a trust. Thus, we must consider whether the contract between PPI and Ohio State created a trust. Pursuant to the Texas Trust Code, there are many methods of creating an express trust. A trust may be created by:

(1) a property owner's declaration that the owner holds the property as trustee for another person;

(2) a property owner's inter vivos transfer of the property to another person as trustee for the transferor or a third person;

(3) a property owner's testamentary transfer to another person as trustee for a third person;

(4) an appointment under a power of appointment to another person as trustee for the donee of the power or for a third person; or

(5) a promise to another person whose rights under the promise are to be held in trust for a third person.

TEX. PROP.CODE ANN. § 112.001 (Vernon 2007).

**5.** Section 112.037(b) further allows a "person having an interest in the welfare of an animal that is the subject of a trust authorized by this section [to] request the court to appoint a person to enforce the trust or to remove a person appointed to enforce the trust." TEX. PROP.CODE ANN. § 112.037(b) (Vernon 2007).

In arguing that the contract does not create a trust, PPI first emphasizes that the only types of trusts governed by the Texas Trust Code are express trusts-not resulting trusts, constructive trusts, business trusts, or deeds of trust. *See id.* § 111.003 ("For purposes of this subtitle, a 'trust' is an express trust only and does not include: (1) a resulting trust; (2) a constructive trust; (3) a business trust; or (4) a security instrument such as a deed of trust, mortgage, or security interest as defined by the Business & Commerce Code."). PPI then argues that the contract between Ohio State and PPI does not create an express trust; instead, it transfers title of the primates in fee from Ohio State to PPI.

■ "A trust is created only if the settlor manifests an intention to create a trust." *Id.* § 112.002. According to PPI, the contract here does not manifest such an intention; it does not indicate that PPI or Ohio State intended to create a trust. For example, an express trust requires a person be named as trustee. *See id.* § 112.001; *Perfect Union Lodge No. 10 v. Interfirst Bank,* 748 S.W.2d 218, 220 (Tex. 1988) (explaining that implicit in the statutory definition of trust "is the requirement of a trustee with administrative powers and fiduciary duties"); *Humane Soc'y v. Austin Nat'l Bank,* 531 S.W.2d 574, 577 (Tex.1975) ("An express devise of property to another as trustee for named beneficiaries is required for creation of an express trust."). PPI emphasizes that the contract here does not name anyone as trustee for the primates. Indeed, the word "trustee" does not appear anywhere in the contract. PPI further points out that the contract also does not mention the terms "trust," "beneficiaries," "settlor," "grantor," or "donor." According to PPI, if it and Ohio State had intended for their agreement to create a trust, then the agreement would

have included these terms. Instead, the contract uses terms like "transfer" and "ownership" to describe their agreement. For example, the contract states that Ohio State is "the owner of all rights, title and interest in the Chimps and Monkeys" and that it "hereby transfers all rights, title and interest in the Chimps and Monkeys to PPI and PPI agrees to accept such transfer, effective when the PPI veterinarian and the Ohio State veterinarian mutually agree that the Chimps and Monkeys have recovered from all pre-shipment procedures and are ready for actual shipment ('the Point of Transfer')." According to PPI, the use of these terms "plainly indicate that the agreement is a bilateral contract under which Ohio State transferred ownership of the chimpanzees and monkeys to PPI and PPI agreed to house and care for them."

In their reply brief, appellants make clear that they are arguing that the contract between PPI and Ohio State created an express trust. An "express trust" is "a fiduciary relationship with respect to property which arises as a manifestation by the settlor of an intention to create the relationship and which subjects the person holding title to the property to equitable duties to deal with the property for the benefit of another person." *Id.* § 111.004 (Vernon Supp.2007). Although acknowledging that the contract does not contain the terms "trust" or "trustee," appellants emphasize that such technical words of expression are not necessary to create a trust relationship. They argue that all that is required is that the beneficiary, the res, and the trust purpose be reasonably clear based on the entire instrument when construed in light of the circumstances surrounding its execution. According to appellants, here, the contract provides for Ohio State funds to be transferred to PPI "with the intent that the funds be used exclusively for the animals' benefit" and

that "PPI accepted the trust property and agreed to be bound to provide the animals with lifetime care." Thus, appellants argue that the "material terms and the trust purpose are clear in light of the circumstances surrounding the execution of the agreement."

It is true that technical words of expression are not essential for the creation of a trust. *Perfect Union,* 748 S.W.2d at 220. A trust is a method used to transfer property. *Jameson v. Bain,* 693 S.W.2d 676, 680 (Tex.App.-San Antonio 1985, no writ). Thus, the trustee holds legal title and possession for the benefit of the beneficiaries. *Faulkner v. Bost,* 137 S.W.3d 254, 258 (Tex.App.-Tyler 2004, no pet.). "To create a trust by a written instrument, the beneficiary, the res, and the trust purpose must be identified." *Perfect Union,* 748 S.W.2d at 220. "It is not absolutely necessary that legal title be granted to the trustee in specific terms." *Id.* "Therefore, a trust by implication may arise, notwithstanding the testator's failure to convey legal title to the trustee, *when the intent to create a trust appears reasonably clear from the terms of the will,* construed in light of the surrounding circumstances." *Id.* (emphasis added).

For example, in *Dulin v. Moore,* 96 Tex. 135, 137, 70 S.W. 742, 742 (1902), the supreme court construed a will in which the testator, after devising real property in fee simple, provided that another person would be "trustee to receive and control the property" during the lives of the devisees. "The court recognized the issue as being whether the testator intended to confer mere 'naked powers' upon the trustee or to invest him with legal title for the purposes of the trust." *Perfect Union,* 748 S.W.2d at 221 (explaining *Dulin's* reasoning). The court concluded that "although the will contains no words which expressly convey legal title to Dulin, the intention

that he should take the legal title is as clearly manifested as if express terms had been employed." *Dulin,* 96 Tex. at 139, 70 S.W. at 743.

Similarly, in *Heironimus v. Tate,* 355 S.W.2d 76 (Tex.Civ.App.-Austin 1962, writ ref'd n.r.e.), the Austin Court of Appeals construed a will in which there were no express words giving the executor legal title to any property. "The will bequeathed property to two beneficiaries but further provided that the executors had discretion in making distributions to the beneficiaries during their lives, and upon their deaths the remainder passed to their lineal descendants." *Perfect Union,* 748 S.W.2d at 221 (explaining *Heironimus* ). "The court concluded that a trust had been created with legal title vested in the executors." *Id.* (citing *Heironimus,* 355 S.W.2d at 80).

In *Perfect Union Lodge No. 10 v. Interfirst Bank,* 748 S.W.2d at 221, the supreme court noted that "[a]s in *Dulin* and *Heironimus,* we must construe a will which lacks specific language conferring legal title upon the executors." The court concluded that "[f]rom the provisions of the will as a whole, A.H. Lumpkin's intent to create a testamentary trust can be ascertained." *Id.* The will "devised all the residue of [Lumpkin's] estate to his wife for her life, with the remainder to Perfect Union Lodge." *Id.* It then provided that "my said executors shall handle my estate during the life of my wife." *Id.* According to the court, this language indicated that "Lumpkin intended to provide for more than a mere settlement of his business affairs and distribution of assets." *Id.* Furthermore, the court reasoned that "the provision granting the executors the powers found under the Trust Act authorized Moursund to exercise greater control over the property than was necessary for administration of the estate." *Id.* Therefore,

pursuant to the language of the will, the court reasoned that Lumpkin "clearly intended to separate the management and control of his residual estate from the beneficial interest conferred upon his wife." *Id.* Thus, the court held that the will "created a testamentary trust for the life of his wife, which would terminate upon her death." *Id.*

Unlike the facts presented in *Dulin, Heironimus,* and *Perfect Union Lodge,* there is no clear intent in the contract between PPI and Ohio State to create a trust to provide for the care of the primates. While appellants emphasize that pursuant to the contract Ohio State transferred funds to PPI with the intent that the funds would be used for the primates' benefit and that PPI agreed to provide for their lifetime care, the contract also states that PPI agrees to accept "ownership" of the primates, that Ohio State "warrants that it is the owner of all *rights, title and interest*" in the primates, that Ohio State "*transfers* all rights, title, and interest" in the primates to PPI and that PPI agrees to accept "such transfer, effective" at "the Point of Transfer," and that if a lawsuit is initiated against Ohio State or PPI after "the Point of Transfer" challenging Ohio State's ownership of the primates, its authority to transfer ownership to PPI or the validity of the "*ownership rights conveyed to PPI*" under the contract, then "ownership" of the primates "shall revert to Ohio State." After reviewing the language used in the contract, we see no intention by Ohio State to create a trust; therefore, we hold that the contract between Ohio State and PPI did not create a trust to provide for the care of the primates.

## CONCLUSION

Because the contract between Ohio State and PPI did not create a trust to provide for the care of the primates, appel-

lants have no standing under section 112.037 of the Texas Trust Code to bring their claims. We, therefore, affirm the trial court's order dismissing the cause for lack of standing.