# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00423-CV

---

**BLF LLC, Bradford W. Bayliff, and Lisa E. W. Bayliff, Appellants**

**v.**

**The Landing at Blanco Property Owners Association, Appellee**

---

### FROM THE 33RD DISTRICT COURT OF BLANCO COUNTY
### NO. CV09083, THE HONORABLE J. ALLAN GARRETT, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

BLF LLC, Bradford W. Bayliff, and Lisa E.W. Bayliff (collectively, the "Bayliffs") filed suit to prevent their property owners association, The Landing at Blanco Property Owners Association (the "Association"), from selling a certain tract of common-area property. In their petition, the Bayliffs allege that they hold legal and equitable property rights in the tract and that any sale without their consent would infringe on those rights.

After the trial granted summary judgment in favor of the Association and dismissed their suit, the Bayliffs filed a notice of appeal in this Court. On appeal, the Bayliffs contend that the trial court erred in granting summary judgment and, alternatively, abused its discretion in denying their motion for continuance. We affirm the trial court's judgment.

1

## BACKGROUND

The Landing at Blanco (the "Landing") is a 1,013.71-acre residential subdivision in Blanco County. The Landing was platted in 2004 for 38 lots—described on the plat as "37 residential lots," "1 amenities center," and "1 airstrip common area." That same year, the Association was formed as a nonprofit corporation. The Landing's Declaration of Covenants, Conditions, and Restrictions (the "Declaration"), first recorded in January 2005, states that the Association's purpose is "to further the common interest of the Members," the Landing property owners.

As authorized by the Declaration, in November 2005, the developer conveyed one of the platted lots—Lot 15, a 39-acre tract—to the Association for use as a common area.[1] Since its conveyance, the Association has used Lot 15 to provide the Landing property owners with various amenities, including a ranch house with cabins, available for rent; a swimming pool; a tennis court; a pond; and an equestrian center. Costs for maintaining the amenities are paid by the Association through assessment funds levied on and collected from the property owners.

In 2018, the Association commissioned two studies to evaluate the necessity and cost of repairs and maintenance of the amenities on Lot 15. The Association first commissioned a property-inspection service, licensed by the Texas Real Estate Commission, to inspect the property and its infrastructure and to report on their condition. Upon completion of the inspection, the inspector recommended replacing the roofs, HVAC systems, and water heaters,

---

[1] Section 8.03 states: <u>Developer's Rights to Convey Common Area to the Association</u>. Developer shall have and hereby reserves the right, but shall not be obligated to, convey Real Property and improvements thereon, if any, to the Association for use as a Common Area at any time and from time to time in accordance with this Declaration, without the consent of any other Owner or the Association.

and addressing plumbing leaks and electrical repairs in the ranch house. The Association then commissioned Lone Star Reserve Studies, LLC, to assess its reserve funds, predict maintenance costs, and develop a funding plan for Lot 15. The results of this study revealed that all but necessary maintenance to the pool and interiors of the buildings had been deferred since 1995, that the Association had not increased members' dues in ten years, and that the reserve fund was $244,548 short of "normal acceptable funding."

After analyzing the results of the commissioned studies, the Association presented the Landing property owners with a choice with regard to Lot 15, in the form of a proposed amendment to its Declaration. At the Association's annual meeting in June 2021, property owners were asked to vote on whether the Association should (1) restore and maintain existing amenities on Lot 15, which would require a one-time assessment of $13,850 per lot and a 27% increase in annual dues, or (2) sell Lot 15, likely resulting in a decrease in annual dues. The property owners voted 26 to 8 to amend the Declaration to specifically allow for the sale of Lot 15 (hereafter, the "June 2021 Amendment").

The Bayliffs filed suit against the Association to prevent it from selling Lot 15.[2] According to the Bayliffs' allegations, the Landing was represented in marketing materials as having fifty-eight-acres of common area that included amenities such as tennis courts, a swimming pool, a fishing pond, and a ranch house. The Bayliffs further allege that they relied on these representations in deciding to purchase their lots. As a result, they sought a declaration

---

[2] The Declaration was amended in June 2015. Bradford and Lisa Bayliff purchased Lot 36 in The Landing in 2014; BLF, LLC, purchased Lot 37 in 2016. The original 2005 version of the Declaration was in effect when Bradford and Lisa Bayliff purchased their lot, and the 2015 version of the Declaration was in effect when BLF purchased its lot. Because no changes relevant to this dispute were made to the Declaration when it was amended in 2015, all references to the Declaration in this opinion are to both versions, unless otherwise noted.

3

that any attempt by the Association to sell Lot 15 was "unlawful, unenforceable, and/or unconstitutional" because it would deprive them of their equitable ownership interests and easement rights in Lot 15. *See* Tex. Civ. Prac. & Rem. Code §§ 37.001-.011.

The Association moved for traditional summary judgment on the Bayliffs' claims. *See* Tex. R. Civ. P. 166a. The Association argued that as a matter of law it possesses broad authority to act in the common interest of the Landing property owners, including the authority to sell common-area property, such as Lot 15. The Association further asserted that the undisputed summary-judgment evidence establishes that Lot 15 was conveyed to it in fee simple, that nothing in the Declaration expressly prohibits the sale of property owned by the Association, and that the Declaration expressly requires it to "do anything that may be necessary or desirable to further the common interest of the [Association] members."[3] Finally, in the alternative, the Association argued that to the extent the Declaration may be construed as prohibiting such a sale, it has properly and validly amended the Declaration to permit the sale of Lot 15 by obtaining the vote of at least two-thirds of the Landing property owners.

In response, the Bayliffs filed a motion for continuance, asserting that additional time was needed to conduct discovery on their claims before a summary judgment would be proper. Subject to their request for a continuance, the Bayliffs filed a response to the

---

[3] Section 9.01 states: <u>General Duties and Powers of the Association.</u> The Association has been formed to further the common interest of the Members. The Association, acting through the Board of Directors or through persons to whom the Board of Directors has delegated such powers (and subject to the provisions of the Bylaws), shall have the duties and powers hereinafter set forth and, in general, the power to do anything that may be necessary or desirable to further the common interest of the members and to improve and enhance the attractiveness, desirability and safety of the Property. The Association shall have the authority to act as the agent to enter into any and all contracts on behalf of the Members in order to carry out the duties, powers, and obligations of the Association as set forth in this Declaration.

Association's motion for summary judgment. In their response, the Bayliffs argued that fact issues exist as to whether they have certain legal and equitable property rights in Lot 15 that prevent the Association from selling Lot 15 over their objections. The Bayliffs supported their response with their own summary-judgment evidence, including a copy of the subdivision plat, the deed conveying Lot 15 from the developer to the Association, and affidavits from Bradford Bayliff and Lisa Bayliff.

The trial court denied the Bayliffs' motion for continuance, granted the Association's motion for summary judgment, and dismissed the Bayliffs' suit. In three issues on appeal, the Bayliffs challenge the trial court's summary-judgment ruling and, in the alternative, the trial court's denial of their motion for continuance.

**STANDARD OF REVIEW**

A party moving for traditional summary judgment must demonstrate that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). We review de novo a trial court's ruling on a motion for summary judgment, viewing the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Erikson v. Renda*, 590 S.W.3d 557, 563 (Tex. 2019). When a trial court grants summary judgment without specifying the grounds for its decision, summary judgment will be affirmed on appeal if "any of the theories advanced are meritorious." *Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

To the extent resolution of the Association's motion for summary judgment required the trial court to construe the Declaration and its restrictive covenants, we review these

issues de novo. *See Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 279 (Tex. 2018). In construing the Declaration, we apply general rules of contract construction. *Purvis v. Stoney Creek Cmty. Ass'n,* 631 S.W.3d 287, 292 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("Regardless of whether the parts of the Declaration that we are construing amount to restrictive covenants, we apply the same contract-interpretation rules to the Declaration."). Our primary task is to determine the drafter's intent from the Declaration's language. *Garrett v. Sympson*, 523 S.W.3d 862, 866 (Tex. App.—Fort Worth 2017, pet. denied). To determine the parties' true intentions, we examine the entire Declaration in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *Purvis*, 631 S.W.3d at 292. If the Declaration is so worded that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and we construe it as a matter of law. *Id.*

## DISCUSSION

In two issues on appeal, the Bayliffs assert that the trial court erred in granting summary judgment in favor of the Association. In their first issue, the Bayliffs argue that the plat and the Declaration restrict the Association's authority to sell common-area property, including Lot 15, because the developer's "original scheme," as reflected in the plat and Declaration, was "premised on centrally situated community parkland and recreational facilities [that] cannot be destroyed." The Bayliffs also argue that, for that same reason, the June 2021 Amendment purporting to authorize the Association to sell Lot 15 is invalid and unenforceable. In their second issue, the Bayliffs assert that any sale of Lot 15 would be invalid because they have legal and equitable property rights in the property that cannot be conveyed without their consent.

In addressing the Bayliffs' appellate issues, we will assume without deciding that prior to the June 2021 Amendment, the Association lacked any authority to sell Lot 15, as the Bayliffs contend, and we will examine whether the June 2021 Amendment, purporting to authorize it to do so now, is valid and enforceable.

**Law Governing Valid Amendments**

Generally, an instrument containing restrictive covenants in a subdivision defines the rights and obligations of property ownership in the subdivision, and the mutual and reciprocal obligations undertaken by all purchasers in a subdivision creates a property interest, possessed by all purchasers. *Adlong v. Twin Shores Prop. Owners Ass'n*, No. 09-21-00166-CV, 2022 Tex. App. LEXIS 1970, at *22 (Tex. App.—Beaumont Mar. 24, 2022, pet. denied) (mem. op.). When buyers purchase property governed by a declaration capable of amendment if certain procedures are followed, they are on notice that "the unique form of ownership they acquired when they purchased their [property] was subject to change through the amendment process, and that they would be bound by properly adopted amendments." *Angelwylde HOA, Inc. v. Fournier,* No. 03-21-00269-CV, 2023 Tex. App. LEXIS 1733, at *8 (Tex. App.—Austin Mar. 17, 2023, pet. filed) (mem. op.) (quoting *Adlong*, 2022 Tex. App. LEXIS 1970, at *23).

To validly amend deed restrictions, three conditions must be met. *Poole Point Subdivision Homeowners' Ass'n v. DeGon*, No. 03-20-00618-CV, 2022 Tex. App. LEXIS 1935, at *7 (Tex. App.—Austin Mar. 24, 2022, pet. denied) (mem. op.) (citing *Wilchester W. Concerned Homeowners LDEF, Inc. v. Wilchester West Fund, Inc.*, 177 S.W.3d 552, 562 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 313 (Tex. App.—Fort Worth 2001, no pet.)). First, the instrument creating the original

restrictions must establish both the right to amend and the method of amendment.  *Id.*  Second, the right to amend implies only those changes contemplating a correction, improvement, or reformation of the agreement rather than its complete destruction.  *Id.*  Third, the amendment must not be illegal or against public policy.  *Id.*

**First Condition for a Valid Amendment**

As to the first condition for amending, it is undisputed that the clear and unambiguous language of the Declaration provides a "right to amend and the method of amendment."  *See id.* (setting out first condition for valid amendment).  Section 10.02 of the Declaration states:

> Amendments. Except for amendment affecting the existing dwelling and the airstrip, this Declaration may be amended or changed, in whole or in part, at any time by the written agreement or by signed ballots voting for such amendment, of the owners having not less than two-thirds (2/3rds) of all of the votes (including Developer) of the Subdivision. . . .  Amendment affecting the airstrip requires the above vote and the agreement of seventy-five percent (75%) of the lot owners using the airstrip.

The Bayliffs do not contend that the Association failed to follow the amending procedures under Section 10.02 in adopting the June 2021 Amendment, including the requirement of obtaining a two-thirds vote.[4]  Instead, the Bayliffs' argument, liberally construed, is that the June 2021 Amendment is void because the second and third conditions for a valid amendment are not met.

---

[4]  Chapter 209 of the Property Code provides certain protections to residential property owners whose property is subject to restrictions and assessment imposed by a homeowners' association.  Even where the declaration is silent as to the voting rights for an amendment, however, the declaration may be amended by a vote of sixty-seven percent (67%) of the lots subject to the declaration.  *See* Tex. Prop. Code § 209.0041.  However, if the declaration contains a lower percentage, the percentage in the declaration controls.  *Id.* § 209.0041(h-2).  Here, the Declaration provides that it may be amended by sixty-seven percent (two-thirds) of "all the votes

8

**Second Condition for a Valid Amendment**

As to the second condition for a valid amendment, the Bayliffs contend that the June 2021 Amendment constitutes a "complete destruction" of the Declaration rather than a "correction, improvement, or reformation." *See id.* at *7 (setting out second condition for valid amendment). In their view, the Declaration establishes that Lot 15 and its amenities are part of a uniform scheme of the Landing development—specifically, a scheme to provide and maintain "the parkland and amenities at the center of the community"—such that any sale of Lot 15 would effectively "destroy the original scheme of development or change its essential nature." *See Couch v. Southern Methodist Univ.*, 10 S.W.2d 973, 974 (Tex. Comm'n App. 1928, judgm't adopted) ("Now, a change of these conditions in any or all respects is not a destruction of the contract, nor does it change the essential nature of the same. It is still a deed of conveyance."). Based on the plain language of the Declaration, we disagree.

The Declaration states that the Association "has been formed to further the common interests of the Members." To this end, the Declaration grants the Association with "the power to do anything that may be necessary or desirable to further the common interest of the members and to improve and enhance the attractiveness, desirability and safety" of the Landing subdivision. The Declaration authorizes, but does not require, the developer to convey additional property to the Association for use as common area, as the developer did for Lot 15. Conversely, the Declaration tasks the Association with accepting any property conveyed by the developer "subject to the terms of . . . all easements, covenants, conditions, restrictions and

---

in the subdivision." Thus, the undisputed summary-judgment evidence shows that the voting requirements under both the Declaration and the Property Code were satisfied.

9

equitable servitude or other encumbrances set forth in the transfer." The Association is required by the Declaration to levy, collect, and enforce maintenance charges, which "shall be used," in part, for "the maintenance of the common areas." The Declaration defines "common areas" as:

> that portion of the Subdivision owned by the Association for the common use and enjoyment of the Members of the Association including but not limited to, all parks, recreational facilities, airstrips, airstrip facilities, gates, walkways, and parking lots.

As to specific common areas, the original 2005 Declaration sets out that the Landing "will include an air park, with its related airstrip, and runways" and that "[t]hese [air park] features are essential to the development of the Property and the [homeowners] are encouraged to use such features." The Declaration defines "[a]irstrip" as "approximately 14.34 acres located within the property, identified as 'Air Strip Common Area' on the plat" and states that the "Association shall have full power and authority to do all such things as are necessary, or deemed by the Association to be advisable, in order to preserve and maintain the air strip." The Declaration provides that the Association may stop maintaining the airstrip only if seventy-five percent (75%) of all property owners and a hundred percent (100%) of the property owners using the airstrip vote not to maintain the airstrip. Similarly, the Association may "demolish any existing improvements, except for the airstrip," which requires the approval of seventy-five (75) percent of all property owners and 100 percent of the property owners using the airstrip.

Although the plain language of the Declaration and the plat contemplate that some portion of the Landing subdivision may be used as common area, it does not set aside any specific lot or require the creation of any particular common area or amenity—save and except the air park. Similarly, the Declaration does not mention or expressly refer to parkland, amenities, a ranch house, a swimming pool, tennis courts, a fishing pond, or similar terms. In

10

sum, we disagree that the "original scheme" and "essential nature" of the Landing development calls for the Association to indefinitely hold and maintain common-area property as parkland or as a recreational area when it reasonably believes that it would be contrary to the collective interest of the property owners to do so. As a matter of law, the Association's June 2021 Amendment satisfies the second condition necessary for a valid amendment.

**Third Condition for a Valid Amendment**

As to the third condition required for a valid amendment, the Bayliffs do not expressly state that the June 2021 Amendment of the Declaration is invalid because it is "illegal or against public policy." *See DeGon*, 2022 Tex. App. LEXIS 1935, at *7 (setting out third condition for valid amendment). However, in their second issue on appeal, the Bayliffs assert that the June 2021 Amendment is a "legal nullity" because it authorizes the Association to convey, without their consent, what they contend are property interests held by Landing property owners and not the Association—namely, equitable title, an express easement, and an easement by estoppel. The Bayliffs also argue that any sale of Lot 15 amounts to an unconstitutional taking of these property interests. *See* U.S. Const. amend V; Tex. Const. art. I, § 17. In other words, reasonably construed, the Bayliffs' argument is that the June 2021 Amendment is illegal and against public policy because it would allow for the conveyance of their individual property rights in Lot 15 over their objections. To determine whether the Association met its summary-judgment burden to establish that the third condition for a valid amendment has been satisfied, we will examine the Bayliffs' claim for declaratory relief as to each of these alleged property interests.

11

*Equitable Title*

First, the Bayliffs assert that the trial court erred in granting summary judgment because the summary-judgment evidence is sufficient to create a fact issue as to whether they have "equitable title in an undivided interest of the parkland and amenities" that prevents the Association from selling Lot 15 over their objections.

Equitable title is a right, enforceable in equity, to have the legal title to real estate transferred to the owner of the right upon performance of specified conditions. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 706 (Tex. 2021); *City of Houston v. Guthrie*, 332 S.W.3d 578, 588 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *Langoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied). In the trust context, the holders of equitable title to property "are considered the real owners," and the trustee vested with legal title "holds [the property] for the benefit of" the equitable-title holder. *Eagle Oil & Gas Co.*, 619 S.W.3d at 706 (quoting *Bradley v. Shaffer*, 535 S.W.3d 242, 248 (Tex. App.—Eastland 2017, no pet.)). In effect, the Bayliffs contend that the developer created a trust in Lot 15, with the homeowners as the beneficiaries and the Association as the trustee. *See Faulkner v. Bost*, 137 S.W.3d 254, 259 (Tex. App.—Tyler 2004) ("When a valid trust is created, the beneficiaries become the owners of the equitable or beneficial title to the trust property and are considered the real owners.").

A trust is a method used to transfer property. *Sarah v. Primarily Primates, Inc.*, 255 S.W.3d 132, 144 (Tex. App.—San Antonio 2008, pet denied); Restatement (Second) of Trusts, § 17 (1959) (noting that a trust may be created by "a transfer inter vivos by the owner of property to another person as trustee for the transferor or for a third person"). To determine if a trust has been created, we look to the settlor's intent. *Sarah*, 255 S.W.3d at 144; *Hubbard v. Shankle*, 138 S.W.3d 474, 486 (Tex. App.—Fort Worth 2004, pet. denied). While technical

12

words are not necessary, the beneficiary, the res, and the trust purpose must be identified in the written instrument. *Sarah*, 255 S.W.3d at 145 (citing *Perfect Union Lodge No. 10 v. Interfirst Bank*, 748 S.W.2d 218, 220 (Tex. 1988)).

In this case, nothing in the deed language conveying Lot 15 from the developer to the Association suggests that the developer intended for the Association to hold title to the property in trust. For example, the deed does not use the terms "trust," "beneficiaries," or "trustee." *See* Restatement (Second) of Trusts, § 25 ("Precatory Words"). Although the Declaration generally defines "common areas" as "that portion of the subdivision owned by the Association for the common use and enjoyment of the members of the Association," including "those areas of land and improvements thereon deeded to the Association," we conclude that this language fails to demonstrate a clear intent to create a trust for the individual benefit of the Bayliffs in Lot 15. *Id.* ("No trust is created unless the settlor manifests an intention to impose enforceable duties.") At best, the Declaration requires the Association to act in the collective interest of the Landing property owners in its maintenance of the Landing common areas, including Lot 15. In short, nothing in the language of the Declaration suggests that the Bayliffs have equitable title to Lot 15, such that any future transfer of the lot by the Association without the Bayliffs' consent would be "illegal or against public policy." *See DeGon*, 2022 Tex. App. LEXIS 1935, at *7.

*Easements*

Next, we consider the Bayliffs' argument that a fact issue exists as to whether they have an express easement or, alternatively, an easement by estoppel that prevents the Association from selling Lot 15 without their consent. *See Fallis v. River Mt. Ranch Prop.*

13

*Owners Ass'n*, No. 04-09-00256-CV, 2010 Tex. App. LEXIS 5152, at *12 (Tex. App.—San Antonio July 7, 2010, no pet.) (mem. op.) (explaining that easement "may be created by express grant, implication, necessity, estoppel, or prescription"). An easement is a nonpossessory interest that allows a holder to use another's property for a particular purpose, but without conveying title. *Stephen F. Austin v. Flynn*, 228 S.W.3d 653, 658 (Tex. 2007). An express easement is considered an interest in land subject to the statute of frauds. *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983); *see* Tex. Bus. & Com. Code § 26.01. "To be sufficient, the writing must furnish within itself, or by reference to some other existing writing, the means or date by which the land to be conveyed may be identified with reasonable certainty." *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 264 (Tex. App.—Austin 2002, no pet.).

To determine whether the Landing property owners, including the Bayliffs, hold an express easement in Lot 15, we examine the deed transferring ownership of Lot 15 from the developer to the Association, along with the Declaration to determine the scope of the transfer. The deed transferring ownership of Lot 15 to the Association does not contain any language suggesting that the developer intended, in the deed itself, to reserve any nonpossessory interests in Lot 15 for the benefit of the property owners. The deed does, however, state that the conveyance to the Association is made "subject to . . . easements . . . and other instruments that affect the property."

The Declaration includes a section entitled, "Article II, Reservations, Exception and Dedications." In Section 2.03 of Article II, the Declaration states:

> Title Subject to Easements. It is expressly agreed and understood
> that the title conveyed by the developer to any of the Tracts . . .
> shall be subject to any easement affecting same for roadways or
> drainage, electric lighting, electric power, telegraph or telephone

14

purposes and other easements hereafter granted affecting the Tracts.

In Sections 2.04, 2.05, and 2.06, the Declaration clearly and unequivocally sets aside "utility easements," an "airspace easement," and a "road easement." Notably absent in Article II is any language purporting to set aside any property as a recreational easement, and the Declaration does not include similar "easement" language in defining "common areas." In short, nothing in the language of the Declaration suggests that the developer intended to grant an express easement on Lot 15 or, even more generally, on any property subsequently conveyed to the Association for use as a common area. *See Sundance at Stone Oak Ass'n v. Northeastern Indep. Sch. Dist.*, No. 04-12-00610-CV, 2013 Tex. App. LEXIS 13857, at *8 (Tex. App.—San Antonio Nov. 13, 2013, no pet.) (mem. op.) ("When considering the express easement's terms, the parties' intentions—as expressed in the grant—determine the scope of the easement."). We disagree with the Bayliffs' assertion that Lot 15 is encumbered by an express easement held by Landing property owners.

Next, we consider whether there is a fact issue as to whether Lot 15 is encumbered by an easement by estoppel. Easement by estoppel is an equitable doctrine whereby courts may, in certain situations, bar a property owner from disputing the existence of an easement on his or her property where the owner has led another property owner to rely to his or her detriment on the easement's existence. *Cambridge Holdings, Ltd., v. Cambridge Condos. Council of Owners,* No. 03-08-00353-CV, 2010 Tex. App. LEXIS 4415, at *50-51 (Tex. App.—Austin June 11, 2010, no pet) (mem. op.); *see also Byrd v. Mahrou*, No. 03-14-00441-CV, 2016 Tex. App. LEXIS 7805, at *9-10 (Tex. App.—Austin July 22, 2016, pet. denied) (mem. op.) ("The essence of the doctrine of easement by estoppel is that the owner of a servient estate may

15

be estopped from denying the existence of an easement by making representations that the owner of the dominant estate then relies on."). An easement by estoppel is an exception to the requirement that the conveyance of an interest in land be in writing. *Storms v. Tuck*, 579 S.W.2d 447, 451 (Tex. 1979). The elements for establishing an easement by estoppel are (1) representation of the easement communicated, either by words or action, by the owner to the promisee; (2) the communication was believed; and (3) the promisee relied upon the communication. *Schwendeman v. BT SFRL I, LLC*, No. 02-19-00007-CV, 2020 Tex. App. LEXIS 861, at *20 (Tex. App.—Fort Worth Jan. 30, 2020, pet. denied) (mem. op.).

In support of their response to the Association's motion for summary judgment, the Bayliffs submitted affidavits by Bradford and Lisa Bayliff. The Bayliffs also attached copies of the Landing's website and other marketing materials, describing the Landing as having fifty-eight acres of common area with "Amenities Galore"—including an equestrian barn, cantina-style bar, pool, and tennis courts. Both Bradford and Lisa Bayliff state in their affidavits that they relied on these materials and, specifically, the promise of access to the common area and its amenities in deciding to purchase and improve their lots. Based on this evidence, we conclude that a fact issue exists as to whether the Bayliffs relied on representations made by the developer that property owners at the Landing would have access to and recreational use of Lot 15. *See Byrd*, 2016 Tex. App. LEXIS 7805, at *13-15 (concluding that evidence was legally sufficient to support finding of easement by estoppel where representations of creek access, including depictions of creek, were made in advertising and e-mails and induced plaintiffs to purchase property in subdivision).

Nevertheless, despite the existence of a fact issue as to whether Lot 15 is encumbered by an easement by estoppel, we cannot conclude that the trial court erred in

dismissing the Bayliffs' claim for a declaration that the Association is prohibited from selling Lot 15 without their consent. Once created, an easement is transferable with the property's title and is enforceable by and against subsequent owners with actual or constructive notice of its existence. *Goodenberger v. Ellis*, 343 S.W.3d 536, 541 (Tex. App.—Dallas 2011, pet. denied). Therefore, even if the Bayliffs successfully prove that they have an easement by estoppel over Lot 15, the existence of the easement would not prevent the Association from selling Lot 15 and, consequently, transferring the easement to a buyer with notice of the easement. Consequently, no genuine issue of material fact exists as to the Bayliffs' claim that (1) they hold property interests in Lot 15 that prevent the Association from selling the lot without their consent, and (2) because the June 2021 Amendment authorizes such a sale, it is "illegal and against public policy." *See DeGon*, 2022 Tex. App. LEXIS 1935, at *7.

### *Constitutional Claim*

Finally, we consider the Bayliffs' argument that any conclusion by the trial court or this Court that the June 2021 Amendment is valid amounts to an unconstitutional taking of their "valuable property rights." *See* U.S. Const. amend. V (stating, "nor shall private property be taken for public use without just compensation"); Tex. Const. art. I, § 17 (stating that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made"). Even assuming that the Bayliffs have a property right in Lot 15, as they contend, nothing in the summary-judgment record suggests that Lot 15 would be taken for "public use" without compensation. No genuine issue of material fact exists as to the Bayliffs' claim that the June 2021 Amendment is unconstitutional. *See also Chu v. Windermere Lakes Homeowners Ass'n*, 652 S.W.3d 899, 904 (Tex. App.—Houston [14th Dist.] 2022, pet.

17

filed) (explaining that "courts should refrain from nullifying a transaction because it is contrary to public policy, 'unless the transaction contravenes some positive statute or some well-established rule of law'").

The trial court did not err in concluding that as a matter of law the June 2021 Amendment is not "illegal or against public policy." *See DeGon*, 2022 Tex. App. LEXIS 1935, at \*7. The summary-judgment record establishes that the three conditions for a valid amendment are satisfied and that, consequently, the June 2021 Amendment—authorizing the Association to sell Lot 15—is valid and enforceable. *Id.* We conclude that the trial court did not err in granting summary judgment against the Bayliffs on their claim for a declaration that any attempt by the Association to sell Lot 15 is unlawful, unenforceable, or unconstitutional. We overrule the Bayliffs' first and second appellate issues.

**Motion for Continuance**

In their third issue, the Bayliffs argue that "to the extent there is any doubt or ambiguity about what the plat and governing documents mean, the trial court abused its discretion" in denying their motion for continuance so that additional discovery may be conducted on this issue. Because we have concluded that the June 2021 Amendment is valid and enforceable based on the plain and unambiguous language of the plat and the governing documents, we overrule this issue.

**CONCLUSION**

Having overruled the appellants' issues on appeal, we affirm the trial court's summary judgment.[5]

_____

Chari L. Kelly, Justice

Before Justices Baker, Kelly, and Smith

Affirmed

Filed: December 13, 2023

---

[5] On November 1, 2023, we conditionally granted the Bayliffs' petition for writ of injunction, prohibiting the Association from selling Lot 15 during the pendency of this appeal. *See In re BLF LLC*, No. 03-23-00487-CV, 2023 Tex. App. LEXIS 8301, at *3 (Tex. App.—Austin Nov. 1, 2023, orig. proceeding) (mem. op.). Having resolved this appeal, we hereby lift our injunction order in cause number 03-23-00487-CV.