# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0256

═══════════

RICHARD T. ARCHER, DAVID B. ARCHER,
CAROL ARCHER BUGG, JOHN V. ARCHER,
KAREN ARCHER BALL, AND SHERRI ARCHER, PETITIONERS,

v.

T. MARK ANDERSON AND CHRISTINE ANDERSON, AS
CO-EXECUTORS OF THE ESTATE OF TED ANDERSON, RESPONDENTS

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════════════════════════

JUSTICE JOHNSON, joined by JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE BROWN, concurring in part and dissenting in part, and concurring in the judgment.

## I. It's Too Soon

I agree with the Court's conclusion that in this case, as was the situation in *Kinsel v. Lindsey*, 526 S.W.3d 411 (Tex. 2017), there is no need to allow the Archers[1] to recover for harm they suffered due to Ted Anderson's intentional interference with the inheritance benefit that in reasonable likelihood they were to receive from Jack Archer. That is because the Archers had adequate remedies otherwise. *Ante* at __. But just as the Court did not see the need to completely reject the cause of action in *Kinsel*, I see no need to do so today. To the contrary, I see the need *not* to do so.

---

[1] Five of Jack Archer's nieces and nephews are parties to this suit—David B. Archer, Carol Archer Bugg, John V. Archer, Karen Archer Ball, and Sherri Archer.

Accordingly, I join the Court's judgment but dissent from its blanket rejection of the type of cause of action the Archers asserted. The cause of action is designed to protect persons damaged by another's intentional interference with a benefit that the persons in reasonable likelihood would have received as an inheritance absent the interference. The exact label and elements of such a cause of action vary slightly from jurisdiction to jurisdiction, between the Restatement (Second) of Torts and the Restatement (Third) of Torts, and commentator to commentator. *See ante* at __ (discussing amendments to the Restatement); *see generally* Diane J. Klein, *River Deep, Mountain High, Heir Disappointed: Tortious Interference with Expectation of Inheritance—A Survey with Analysis of State Approaches in the Mountain States*, 45 IDAHO L. REV. 1 (2008) (discussing the adoption of the cause of action in the various Mountain States). The Court refers to the cause of action generally as "intentional interference with inheritance," so for consistency and ease of reference, I will also use that label.

The Court says that probate law protects a donor's right in freely choosing how to dispose of his or her property. *Ante* at __. Of course it does, at least to a large degree. But not always. Where I part ways with the Court is over its conclusion that there are and will be no circumstances under which a tort for intentional interference with inheritance need be available to Texans, even though such a cause of action might be the only viable avenue of relief against someone who wrongfully took or diverted assets in frustration of the asset owner's intent. The Court's justification? "Because existing law affords adequate remedies for the wrongs the tort [of intentional interference with an inheritance] would redress, and because the tort would conflict with Texas probate law . . . ." *Ante* at __.

2

I disagree with both reasons. As to the first reason, I disagree that the Court can realistically predict that the law in its current state affords adequate remedies for all situations that might arise in the future where bad actors wrongfully relieve elderly persons of assets intended for others. With respect, the Court's confidence in existing remedies is too great in light of human experience with those among us who prey on the elderly. As to the second reason, the cause of action would not conflict with probate law but would augment it when properly cabined in. Both probate law and the cause of action for intentional interference with inheritance are designed to protect persons' rights to transfer their property to whomever they choose.

At a minimum, withholding a decision about whether to recognize or reject the tort until the full effects of our decision in *Kinsel* can be seen and evaluated poses little downside. To begin with, *Kinsel* and this case are the first two cases in which the Court has directly addressed the cause of action. Next, the courts of appeals have considered the cause of action in only a relatively small number of cases, and that small number does not portend a large number of such claims waiting to be pursued. That is especially so in light of our explaining the limits of the cause of action in *Kinsel.* And an increase in cases would be even less likely if, in this case, we were to follow and reinforce *Kinsel*'s lead. Were we to do so, then between *Kinsel* and this case, we would have firmly clarified just when the cause of action could be maintained: only if no other theory of liability or avenue of relief is available. Under the circumstances, there likely would be little confusion about if and when the cause of action would be viable.

## II. Diminished Capacity in the Elderly - A Growing Issue

Jack Archer's stroke left him with diminished capacity to manage his affairs and susceptible to manipulation by his long-time friend, Anderson. Anderson did not take advantage of Jack's condition to benefit himself. But whether his actions benefitted him is not the real question. The question is who had the right to determine how Jack's assets would be disposed of and who would receive his estate. Here, the evidence supports the jury's finding that Anderson did not, and that his actions in relation to Jack, Jack's assets, and Jack's estate were tortious.

Jack's condition of diminished capacity is not unusual among the aging population where stroke, illness, or just the general infirmities of age can reduce the ability to manage one's affairs generally, properly care for one's business and assets, and resist the influence of others over those decisions. Such reduced capacity creates opportunities for the elderly to be taken advantage of, even to the point of their being persuaded or coerced into taking actions that directly contradict earlier, competently professed desires regarding disposition of their estates, as happened with Jack. The problem is not inconsequential and it is growing. Texas has the third largest elderly population among the states. *See* TEXAS DEMOGRAPHIC CTR., AGING IN TEXAS: INTRODUCTION 2–3 (2016) (defining "older" or "elder" population as "those aged 65 years and older"). The elderly population in Texas grew by 49.5% from nearly 2.1 million in 2000 to nearly 3.1 million in 2014. *Id.* at 3. This type of growth will inexorably lead to more and more Texans being in the position in which Jack and the Archer family found themselves—an older person with diminished capacity being taken advantage of to the detriment of that person's desires as expressed before his capacity became

4

diminished, or if no desires had been expressed, then to the detriment of the natural objects of his affections.

Texas is making progress in providing protections for its aging citizens and their assets. *See, e.g.*, TEX. EST. CODE § 1101.151 (providing for the court appointment of a guardian with full authority over an incapacitated person upon a finding that the proposed ward is totally without capacity to care for himself, manage his property, operate a motor vehicle, make personal decisions regarding residence, and vote in a public election); TEX. GOV'T CODE § 155.102 (requiring certification for certain guardians). This Court has brought issues relating to Texas's expanding elderly population to the forefront in several ways. Two of these are the establishment of a Working Interdisciplinary Network of Guardianship Stakeholders (WINGS), and calling for the Texas Judicial Council, the policy-making body of the judicial branch of government, to study issues related to the aging population and make recommendations for reforming Texas's approach to issues involving our elderly.

But even with these efforts, experience teaches that where there is opportunity for persons to take advantage of others, they will do so in inventive and unusual ways that simply cannot be fully anticipated. In written testimony to the United States House of Representatives Committee on Ways and Means dated March 22, 2017, David Slayton, the Administrative Director for the Texas Office of Court Administration (OCA), reported that pursuant to a pilot project to assist Texas courts in monitoring guardianship cases, OCA has reviewed over 13,600 guardianship cases in fourteen Texas counties. According to Slayton's testimony:

1. As of December 31, 2016, there were 51,388 active guardianships in Texas; the number had increased by 37% in the preceding five years; guardianships were one of the fastest growing case types in the state; and the estimated value of estates under guardianship in Texas exceeded 5 billion dollars.

2. The majority of guardians appointed in Texas are licensed attorneys, family members, or friends of the ward.

3. Forty-three percent of guardianship cases were out of compliance with reporting requirements of law, and the large majority of those cases were cases in which family members of friends were guardians.

4. A review of accountings that *were* filed showed that on a regular basis there were: unauthorized withdrawals from accounts, unauthorized gifts to family members and friends; unsubstantiated and unauthorized expenses, and a lack of backup data to substantiate accountings.

*Examining the Social Security Administration's Representative Payee Program: Joint Hearing on Who Provides Help Before the Oversight Subcomm. and Social Sec. Subcomm. of the H. Ways & Means Comm.*, 115th Cong. (2017) (statement of David Slayton, Administrative Director, Office of Court Administration, Texas Judicial Branch).

The OCA study did not include the innumerable elderly for whom no formal guardianship was established, as was Jack's situation from August 1998 until December 1999. And even if formal guardianship proceedings have shortcomings in protecting the elderly with diminished capacity and their assets as is shown by the OCA's study, how much more protection do the elderly with diminished capacity need when there is no formal guardianship and no pretense of supervision such as is provided for in a formal guardianship proceeding? In my view, much. And the family or other persons who have expectations of inheriting from an older family member or friend are logically the most likely to raise the question of whether improper advantage has been taken of an older person. This case demonstrates how such a tort, properly limited, works to enforce the principle that when

testators have freely made provision for disposition of their estates, those decisions will be protected by the law.

### III. An Expectancy Based on More Than Speculation

Before his stroke, Jack executed his 1991 will. No one questions the validity of that will, which left the bulk of his estate to his family. The evidence is practically uncontroverted that the 1991 will was the last valid instrument expressing Jack's freely adopted intended disposition of his estate. So the distribution of Jack's estate was effectively locked in before Anderson began influencing Jack's post-stroke decisions. Thus, the expectancy of inheritance the Archers had as to Jack's estate was more than a speculative hope. If, after Jack's stroke, Anderson had convinced him to transfer assets to a third party who then consumed or dissipated the assets before Jack died, or to a third party who disappeared, and the Archer family did not discover the transfers until after Jack's death, then both Jack's reasonable expectancy that his last valid will would control the disposition of his estate, and the Archers' reasonable expectancy of inheriting the bulk of his estate in accordance with his last competent intentions would have been frustrated. Why? Because there would have been no estate. Under those circumstances, the remedies of a constructive trust and restitution would have been of little, if any, benefit to the Archers in enforcing Jack's intent regarding his estate. Thus, the existence of a gap-filling cause of action against Anderson for interference with the Archers' expectancy of inheritance might well have been the only viable vehicle to remedy Anderson's actions. Even if a remedy other than tortious interference with expectancy of inheritance was viable in such a situation, then having the tortious interference remedy as a backup would do no harm. And if, under all the facts, another remedy was not viable,

the tortious interference cause of action might well afford relief where otherwise there would be none. However, the situation where after his stroke, Jack's estate was intentionally diverted or dissipated and the perpetrators or assets gone, is not before us. In the case that *is* before us, the Archers had, and took advantage of, adequate remedies available to them, other than a claim for tortious interference with their reasonable certainty of inheriting from Jack in accordance with the intentions he expressed in his 1991 will. That is also what the plaintiffs in *Kinsel* did. There we noted that although this Court has not recognized a cause of action for intentional interference with inheritance, some courts of appeals had—including in two cases where we denied petitions for review. *Kinsel*, 526 S.W.3d at 422–23 & n.4 (citing *Stern v. Marshall*, 471 S.W.3d 498, 516 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Magana v. Citibank, N.A.*, 454 S.W.3d 667, 685 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re Estate of Valdez*, 406 S.W.3d 228, 233 (Tex. App.—San Antonio 2013, pet. denied); *In re Estate of Russell*, 311 S.W.3d 528, 535 (Tex. App.—El Paso 2009, no pet.)). Nevertheless, we saw "no compelling reason to consider a previously unrecognized tort if the constructive trust [awarded in the case] proved to be an adequate remedy." *Id.* at 424 (noting that a relevant factor when considering an unrecognized cause of action is the existence and adequacy of other protections). We went on to conclude that the constructive trust provided redress for the injuries, so the facts did not warrant enlarging the body of Texas's tort law by recognizing a new cause of action. *Id.* at 425.

In regard to the intentional interference with expectation of inheritance question, this case is postured similarly to *Kinsel*. The Court concludes that the Archers had an adequate remedy because they ultimately received their inheritance, albeit minus attorney's fees and a settlement with

8

the charities. *Ante* at ___. But rather than leaving open the issue of whether to recognize the cause of action as we did in *Kinsel*, the Court changes course and closes that door. It does so even though that door might, in some instances, provide the only avenue to relief for parties who suffer loss at the hands of actors who intentionally—not merely negligently—caused the loss. The Court indicates that we should do so now in order to eliminate confusion based on conflicting decisions in the courts of appeals in Houston. *Ante* at __. The Court points out that after our opinion in *Kinsel* issued, the Court of Appeals for the First District recognized the cause of action in *Yost v. Fails*, 534 S.W.3d 517, 530 (Tex. App.—Houston [1st Dist.] 2017, no pet.), while the Court of Appeals for the Fourteenth District declined to do so in *Rice v. Rice*, 533 S.W.3d 58, 63 (Tex. App.—Houston [14th Dist.] 2017, no pet.). But in *Yost*, the first court did not award damages for intentional interference with an inheritance. 534 S.W.3d at 531–33. So even taking these two cases into consideration, I am confident that Texas courts are fully capable of prospectively applying the guidance in *Kinsel* regarding intentional interference with inheritance cause of action—guidance that would be emphasized and more fully explained in this case should we choose to follow the same path we took in *Kinsel.*

The Court says that a judicially recognized gap-filler cause of action is unnecessary because statutory probate law provides adequate remedies. *Ante* at __. My overriding concern is that neither we nor the courts of appeals have considered a sufficient spectrum of factual circumstances for us to confidently conclude that foreclosing the cause of action will not leave parties without any avenue of relief against those whose actions intentionally and wrongfully divest an elderly person with

9

diminished capacity of assets and thus interfere with that person's last-expressed true intentions about the disposition of his or her property.

The Court addresses and dismisses four fact scenarios that commentator Diane J. Klein argues necessitate the recognition of the tort of intentional interference with an inheritance. *Ante* at ___ (citing Diane J. Klein, *A Disappointed Yankee in Connecticut (or Nearby) Probate Court: Tortious Interference with Expectation of Inheritance—A Survey with Analysis of State Approaches in the First, Second, and Third Circuits*, 66 U. PITT. L. REV. 235, 247 (2004)). While acknowledging that these scenarios are "by no means an exhaustive list," the Court concludes that it is "unable to imagine a situation in which the lack of a full remedy is not a legislative choice or a matter for targeted legislative amendments to probate law and procedures." *Ante* at ___. But even allowing for what the Court describes as the Legislature being "active and creative in protecting the vulnerable," *ante* at ___, it is beyond reasonable belief that all the possible circumstances and designs of persons focused on taking advantage of those with diminished capacity have been anticipated, or are even capable of being anticipated. After all, that is the reason common law causes of action and remedies have arisen—although I do not dispute that probate law will be applicable and provide an adequate remedy in many situations.

Nevertheless, under certain circumstances probate proceedings may not be a viable option for relief to a would-be beneficiary. For example, such a proceeding might offer no relief in a case where the statutory probate limitations period expired before the would-be beneficiary learned of the testator's death, as was the situation in *Schilling v. Herrera*, 952 So. 2d 1231, 1237 (Fla. Dist. Ct. App. 2007) (holding that the plaintiff's tort claim was not barred by the plaintiff's failure to

10

appear in a probate proceeding when the defendant concealed the testator's death until after the expiration of the statutory limitations period). And another example might be where the wrongful interference occurs with a decedent's nonprobate assets, such as payable on death accounts or life insurance proceeds. *See Valdez v. Ramirez*, 574 S.W.2d 748, 750 (Tex. 1978). But as I have noted above, experience teaches that it is impossible to anticipate the limitless ways in which unscrupulous persons can take advantage of others, in this instance elderly persons. Indeed, if those ways could be anticipated, then preventative measures would already have been devised, publicized, and widely adopted. And there would be negligible (well, at least a reduction of) fleecing of our older population. But that is not going to happen. So long as humans with human traits and desires exist, there will be those among us who devise new and more effective ways of taking advantage of the vulnerable elderly who have assets.

The Court recognizes that a constructive trust can provide a remedy for unfairness. *Ante* at ___. But the typical remedy of imposing a constructive trust resulting from a successful restitution action is not always available or may not provide an adequate remedy, as this Court has recognized. While we have stated that "[t]he specific instances in which equity impresses a constructive trust are numberless," *Pope v. Garrett*, 211 S.W.2d 559, 560 (Tex. 1948) (quoting 4 POMEROY'S EQUITY JURISPRUDENCE § 1045, at 97 (5th ed. 1941)), we have also acknowledged that "the reach of a constructive trust is not unlimited." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015). The imposition of a constructive trust generally requires the requesting party to establish (1) a breach of a special trust or fiduciary relationship or actual or constructive fraud, (2) unjust enrichment of the wrongdoer, and (3) an identifiable res that can be traced back to the original

11

property. *Id.* As applied in the inheritance context, the would-be beneficiary must trace the fraudulently obtained property to funds received by the wrongdoer. *See Meadows v. Bierschwale*, 516 S.W.2d 125, 133 (Tex. 1974) (stating that "[w]hen property subject to a constructive trust is transferred, a constructive trust fastens on the proceeds"). However, if the property has been dissipated or traceable funds have been depleted, there will be nothing remaining upon which to impose a constructive trust. A judgment obtained from a tort action, on the other hand, would provide the expectant beneficiary with at least potential redress.

Some states have recognized the tort of interference with inheritance and have adopted what are seemingly pragmatic and workable standards. *See, e.g.*, *Doughty v. Morris*, 871 P.2d 380, 384 (N.M. Ct. App. 1994) (recognizing the tort of tortious interference with an expected inheritance and requiring a plaintiff to prove "(1) the existence of an expectancy; (2) a reasonable certainty that the expectancy would have been realized, but for the interference; (3) intentional interference with that expectancy; (4) tortious conduct involved with interference, such as fraud, duress, or undue influence; and (5) damages"); *DeWitt v. Duce*, 408 So. 2d 216, 218 (Fla. 1981) (discussing a claim for wrongful interference with a testamentary expectancy and when such a claim is considered a collateral attack on a probate decree). Of course, the elements of a cause of action in Texas would not necessarily mirror the elements of the action in other states. But the experience of other states can give focus and guidance.

In the end, it is hard to overestimate the creativity of those seeking to obtain or redirect money or assets that belong to another. Members of the increasing aging population with money and assets are ripe targets for predators. Said another way, the current target-rich environment for

12

those who would prey on our elderly is expanding. I would not now foreclose the option of a tort action for intentional interference with inheritance to be used in circumstances where no alternative adequate remedy is available, and the tort would provide the only avenue for relief. The appropriate situation for recognizing the tort did not present itself in this case. However, the past does not control the future— it only undergirds it. The number of cases in which the cause of action has been asserted in the past indicates the potential for an increase in the number of cases asserting such claims. And if we were to use this case to reinforce what we said in *Kinsel*, it would surely foreclose most claims for intentional interference with inheritance.

Finally, the persons benefitted by the Court's action today are those who prey on some of the most vulnerable among us—seniors who have worked to accumulate estates to care for themselves in their twilight years, and to at death, either pass those estates on to their loved ones or distribute however else they might decide. We should be both sensitive to the needs of that vulnerable segment of the population and protective of their right to distribute the fruit of their life's work to whomever they competently and validly choose. I would not run the risk of shielding those who prey on them from being held responsible for their actions.

## IV. Conclusion

I join the Court's judgment affirming that of the court of appeals. But I respectfully dissent from the Court's barring the possibility of tort relief to those persons damaged by another's intentional interference with a benefit that the person in reasonable likelihood would have received as an inheritance. I would follow the approach we took in *Kinsel*. That is, I would go no further

13

than to hold that we need not recognize the cause of action in this case and reserve judgment about whether to completely foreclose it.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** June 22, 2018