# Supreme Court of Texas

════════════

No. 20-0366

════════════

Elephant Insurance Company, LLC,

*Petitioner*,

v.

Lorraine Kenyon, Individually and as Executrix of the Estate of
Theodore Kenyon,

*Respondent*

════════════════════════

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

════════════════════════

**Argued November 30, 2021**

JUSTICE YOUNG, joined by JUSTICE BLACKLOCK, concurring.

The Court's clear and well-written opinion faithfully and accurately applies our precedents regarding the judiciary's role in creating new duties under the tort of negligence. No party has asked us to do anything beyond applying those precedents, so I gladly join both the Court's opinion and its judgment.

I write separately to suggest that, in a proper case, we should reconsider those precedents. Imposing a legal duty is no small thing, given the massive consequences that can flow from doing so or refusing

to do so.  Under our precedents, to decide whether to create a new duty, we are supposed to identify, then "weigh" or "balance," the following:

- social questions;

- economic questions;

- political questions;

- the social utility of the parties' behavior;

- the various burdens and benefits associated with the proposed new duty;

and more.  *See ante* at 11–12 (citing cases).

Considerations like these, I hope, would motivate a sensible *lawmaker*.  But in virtually any other context, would anyone think that such a list appropriately describes the *judicial* function?  Indeed, this Court's repeated assurances that public policy belongs to the political branches are practically a cliché—the good kind of cliché, in which something is so clearly true that its repetition becomes almost pointless.[1]

---

[1] To take but a few recent examples, *see, e.g.*, *In re State*, 602 S.W.3d 549, 550 (Tex. 2020) ("Limitations on voting by mail have long been a subject of intense political debate, in this State and throughout the country.  We, of course, take no side in that debate, which we leave to legislators and others."); *Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 348 (Tex. 2019) ("When should local taxpayers be on the hook for 'the costs and consequences of improvident actions of their governments'? . . .  'These are precisely the kinds of issues more suited to the Legislature than the courts.'") (citation omitted); *Archer v. Anderson*, 556 S.W.3d 228, 238 (Tex. 2018) ("[W]e are unable to imagine a situation in which the lack of a full remedy [in the context of interference with an inheritance] is not a legislative choice or a matter for targeted legislative amendments to probate law and procedures.  A general interference tort is not a solution."); *Morath v. The Texas Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 853 (Tex. 2016) ("Courts should not sit as a super-legislature.  Nor should they assume the role of super-laboratory.

2

To be sure, judges *were* lawmakers by necessity as the common law took form. Volume upon volume, article upon article—many well worth the read—describe the rise of the common law from the mists of history. It was entirely proper for judges to make the common law—or, as they thought, to "discover" it.[2] In England, the judiciary was an arm of the king, after all.[3] Even aside from that, judges made law with complete propriety because the legal superstructure depended on *someone* filling in the gaps. Parliament—itself a kind of court, after all—was ill equipped to promulgate capacious and systematic legal codes laying out tort duties. Despite today's surfeit of administrative agencies, with their intricate (indeed, often tedious) regulatory frameworks, the vast administrative state was unimaginable until comparatively recently. Early in Anglo-American legal history, therefore, disputes could be resolved either by judges setting enforceable standards for private conduct, or by feuds and war.

---

They are not equipped to resolve intractable disagreements on fundamental questions in the social sciences."); *Strickland v. Medlen*, 397 S.W.3d 184, 196 (Tex. 2013) ("The judiciary . . . while well suited to adjudicate individual disputes, is an imperfect forum to examine the myriad policy trade-offs at stake [in deciding whether to allow recovery for negligent destruction of a dog] . . . . Because the judiciary was an imperfect decider, courts decided legislatures should decide.").

[2] For most of the history of the common law, it seemed self-evident that "[j]udicial decisions . . . did not make law but merely declared what it was." Sir John Baker, *An Introduction to English Legal History* 206 (5th ed. 2019).

[3] "Queen's Bench" and "Crown Court" have no parallels here—there is no "Court of President's Bench" or "Governor's Court." Our Framers understood the English constitutional practice, and they consciously *changed* it to ensure that the judiciary was separate and independent from the other branches.

The common law was thus a great blessing. Judicial decisions provided stability for the entire realm,[4] allowing everyone—ordinary people and the high and mighty—to order their affairs. "The ability of a government to commit to private rights and exchange is . . . an essential condition for growth." Douglass C. North & Barry R. Weingast, *Constitutions and Commitment: The Evolution of Institutions Governing Public Choice in Seventeenth-Century England*, 49 J. Econ. Hist. 803, 808 (1989). The common law supplied that condition because its rules were predictable and their enforcement was routine: "For economic growth to occur the sovereign or government must not merely establish the relevant set of rights, but must make a credible commitment to them." *Id.* at 803; *see id.* at 819 (describing how, "[b]y limiting the ability of the government to renege on its agreements, the courts played a central role in assuring a commitment to secure rights").[5] Where the

---

[4] Before the Norman Conquest, "there was no body of uniform [private] law, as distinct from the customs or folk-right which varied from place to place . . . . There was no unified English legal system." Baker, *supra*, at 13.

[5] It is easy to oversimplify legal, economic, and political history, of course. But there is nothing novel in observing how unlikely it would have been for a small, remote island like Britain to grow to international prominence without the economic growth made possible by the stability, predictability, and liberty that its legal system provided. Friedrich Hayek credited the common law with producing "[t]he freedom of the British which in the eighteenth century the rest of Europe came so much to admire . . . ." 1 F.A. Hayek, *Law, Legislation and Liberty: Rules and Order* 85 (1973). Other analysis supports the notion that the common-law tradition's commitment to enforceable private rights plays a meaningful role in galvanizing economic growth. *See, e.g.*, Paul G. Mahoney, *The Common Law and Economic Growth: Hayek Might Be Right*, 30 J. Legal Stud. 503, 504–05, 514–23 (2001). "What mattered for economic performance was a level of confidence that made it possible to transact with non-kin, and increasingly with people who were almost strangers." Joel

rule of law is in short supply, sustained prosperity is likely to be wanting too.

In my view, the foregoing observations are commonplace, even though the story is far more detailed than can profitably be explored in a short concurring opinion. Far from trying to break any new ground, my point is that I readily embrace the history of the common law and the role that its judges—many of them truly extraordinary—played in its formation. Those judges *had* to derive the law's legal principles from what they took to be shared moral premises and a shared conception of what was right.

Common-law judging was not limited to the age of legend, of course. The law of torts, and especially negligence, is a good example of the more modern relevance of common-law judging. Negligence grew into recognizable proportions not during the era of mounted knights but of the railroad. "[T]he law of torts was totally insignificant before 1800, a twig on the great tree of law. The old common law had very little to say about personal injuries caused by careless behavior." Lawrence M. Friedman, *A History of American Law* 350 (3d ed. 2005). "The railroad,

---

Mokyr, *The Enlightened Economy: An Economic History of Britain 1700-1850*, at 368–69 (2009). "[T]he law itself . . . made the bargaining process more likely to result in cooperation, since knowledge of the law, as well as the costs of going to trial, was common to both sides." *Id.* at 376–77. As society became *more* prosperous, the need for litigation *declined*. *Id.* at 372. After all, "both sides knew that reneging on promises would be penalized." *Id.* at 25. So while it would be "a gross oversimplification" to credit *all* of this to the *state's* enforcement of the law, *id.* at 378, "[w]ell-enforced property rights, including 'law and order,' are surely crucial if investment is to be carried out," *id.* at 410. The common law provided the requisite confidence that the law was fair, predictable, and enforceable.

in general, was crucial to tort law. Almost every leading case in tort law was connected, mediately or immediately, with the iron horse." *Id.* at 351. Thus, "it was in the late nineteenth century that this area of law (and life) experienced its biggest spurt of growth." *Id.* at 350; *accord* W. Page Keeton et al., *Prosser and Keeton on Torts* § 53, at 357 (5th ed. 1984) ("The period during which [negligence law] developed was that of the industrial revolution . . . .").

In other words, when the Industrial Revolution brought its many wonderful but fearsome technological changes, common-law judges were still working in the old common-law ways. Why would they have done otherwise? Legislative output was greater than in much earlier ages, but it was a difference of degree rather than of kind; comprehensive regulatory statutes were still for the future. The administrative state was even more distant. Indeed, the first federal agency (at least, in the sense that we think of them now) came only in 1887—the Interstate Commerce Commission, which was, perhaps unsurprisingly, inspired by the railroads (but to address economic, not tort, regulation). *See, e.g.*, Friedman, *supra*, at 329, 337–39.

We are quite differently situated today. Unlike the judges who developed the law of negligence, today's judges routinely see comprehensive statutory and regulatory schemes, and we know of the vast administrative apparatus set up by our national and state legislatures to address many of the common experiences of life. This case, for example, arises in the context of processing automobile-insurance claims. We now have the Texas Insurance Code—a pervasive codification of a plethora of statutes. We have an entire agency, the

Texas Department of Insurance, with many officials and many regulations all focused on that particular topic.

Today, it is increasingly less likely than ever before that there are gaps that judges alone can (much less should) fill. Through their elected political representatives, the People have taken far greater control of delineating who owes what duty to whom in nearly every conceivable context. In a self-governing society, this development is proper. Whatever one may think about any specific policy outcome, it is better for the political branches of our government to grasp the nettle, rather than, through inaction, to leave major domains of social policy to judges.

Our branch's core role is unchanging, though, because our core role is not to *adjust* or *make* the law, but to *interpret* and *apply* it. More than ever before, today's courts must interpret complex and interlocking statutes and regulations; subject them to constitutional scrutiny when appropriate; and perform the frequently difficult and delicate task of applying them in individual cases. This work is every bit as important to our society as the development of the common law was to our ancestors. Stability and predictability—particularly when it comes to how we interpret the ever-expanding reams of statutory and regulatory law—remain urgent judicial objectives. But for that very reason, one basic premise of the common law—the need for courts to fill in the gaps because the rest of the government would or could not—is less urgent than before.

None of this suggests that the Texas judiciary may wash its hands of the common law, of course. Far from it. Rather, what warrants reconsideration is *how* we attend to the common law and how we talk

7

about doing so. This Court's decision in *Texas Mutual Insurance Co. v. Ruttiger*, 381 S.W.3d 430 (Tex. 2012), is instructive. *Ruttiger* overruled *Aranda v. Insurance Co. of North America,* 748 S.W.2d 210 (Tex. 1988). *Aranda* had created a new common-law cause of action based upon our still-fresh decision in *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex. 1987), which had recognized a duty of good faith and fair dealing between an insurer and an insured. *Aranda* expanded that duty to the workers-compensation context. 748 S.W.2d at 212–13. The year after *Aranda,* the legislature comprehensively reformed Texas workers-compensation law—an effort that had in fact begun before we decided *Aranda. See Ruttiger*, 381 S.W.3d at 447. In so doing, the legislature addressed every perceived gap that *Aranda* had sought to fill. *Id.* But for several decades, the statutory and common-law remedies coexisted, even though the latter functionally undermined the former by disincentivizing compliance with the carefully calibrated statute. *Id.* at 450–51. Thus, the question for us was whether we should conclude that the common-law duty *that we had created* remained appropriate given these legislative developments, even though the legislature never expressly repudiated the *Aranda* cause of action.

We concluded that this Court could most properly discharge its common-law duty by overruling *Aranda. Id.* at 451. "[T]he question is to what extent the judiciary will respect the Legislature's function of addressing the concerns and adjusting the rights of parties in the workers' compensation system as part of its policy-making function." *Id.* at 450. "It was the Court's prerogative to recognize the need to extend *Arnold*'s extra-contractual common law cause of action when it decided

8

*Aranda*; it is the Court's prerogative and responsibility to recognize if the cause of action is no longer appropriate." *Id.* at 451.

I suspect that as other sources of law proliferate, our common-law garden will require more pruning than fertilizing. Our case law—including today's decision—reflects that this already has happened.[6] As gaps in the law shrink, the need for a robust gap-filling function diminishes. To be clear, I am not forecasting, much less inviting, an iconoclastic repudiation of existing common-law doctrines. It would be reckless to dismiss our treasured common-law inheritance, on which so much of our statutory and even constitutional heritage is built. But I do think that, as in *Ruttiger*, we should respond when the political branches' actions have caused the rationale for a common-law duty to ebb or when those branches have filled a gap that courts once perceived.

Acknowledging when the common law has been displaced is an act of *fidelity* to the common-law origins of torts. The judiciary, after all, exists to serve the People, not to rule them. The common-law courts served the People by marking boundaries when the legal terrain was otherwise uncharted. Today's courts serve the People by facilitating self-government, which may mean—at least in highly regulated and deeply familiar contexts, like automobile-insurance claims processing—that we disclaim direct judicial lawmaking and instead limit ourselves

---

[6] *See, e.g., Ruttiger*, 381 S.W.3d at 458 (Willett, J., concurring) ("In the past, this Court has been hesitant to extend common-law causes of action into fields where a pervasive regulatory scheme controls, specifically because of this potential for interference. We should exercise similar deference when considering whether to draw back an extra-statutory remedy in light of legislative changes.") (footnote omitted).

9

to construing and applying the law that the political branches have enacted.

In such contexts, I find it highly unlikely that we could properly "discover" a new duty lurking in the shadows after all these generations. And given the degree of positive law and regulation on the subject, it seems implausible that we could legitimately "make" new law to fill in a gap. So in a case like the one we decide today, what is really gained by continuing to speak of identifying and balancing social, economic, and political considerations? Perhaps we should just openly say that the era of tort exploration is over, at least in the face of regulatory saturation.[7]

I will end by noting that our precedents that ask us to assess social, economic, political and other considerations are less hoary than we might think. The Court here relies on *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017) and *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004). *See ante* at 12. These cases rely on the factors found in *Greater Houston Transportation Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) and *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983).

*Otis* is not so old, but it is the oldest case in the Court's string of citations that speaks of creating duties based on assessing considerations that generally are not within the judicial ken. Relying

---

[7] To be clear, I speak today of possibilities but commit myself to no particular step until a proper case arises. I further anticipate that, if we reconceive our role, we would do so cautiously, and would not abandon the possibility that genuinely *new* contexts (unlike today's and many others) may arise and that, if they do, they might present circumstances where courts can legitimately deploy common-law authority, at least pending action by the political branches.

primarily on Dean Prosser's *The Law of Torts* (4th ed. 1971), *Otis* declares as follows: "If, as Prosser asserts should be done, we change concepts of duty as changing social conditions occur, then this case presents the Court with the opportunity to conform our conception of duty to what society demands." 668 S.W.2d at 310. And then it was off to the races without much restraint, as the dissent by Justice McGee, joined by Chief Justice Pope and Justices Barrow and Campbell, suggested at length. *Id.* at 311–19.

The *Otis* majority's declaration seems jarring to me in light of our repeated statements that we leave policymaking based on the social sciences to the branches that have both the competence and institutional legitimacy to make such decisions. But *Otis*'s declaration fits well within the "social, economic, and political questions" formulation that we are still using today.[8] Prosser, the ostensible source of *Otis*'s enthusiasm, appears to trace the early American cases examining duty back to an 1883 Vermont case. *See* William L. Prosser, *The Law of Torts* § 43 at 254 & n.52 (4th ed. 1971) (citing *Stevens v. Dudley*, 56 Vt. 158 (1883)).

I mention all this not to enter a historiographical debate but to emphasize that our current "social, economic, and political questions"

---

[8] Even *Otis* does not expressly mention "political questions," although its rather self-assured sense of judicial competence did so in all but name. And in fairness to *Otis*, I readily acknowledge that other cases in that vintage have used similar (but perhaps less grandiose) language. *See, e.g.*, *El Chico Corp. v. Poole*, 732 S.W.2d 306, 310 (Tex. 1978) ("[T]he common law is not frozen or stagnant, but evolving, and it is the duty of this court to recognize that evolution. . . . Our courts have consistently made changes in the common law of torts as the need arose in a changing society.").

framework dates back more to the time of Governor William Clements than of King William I (or even William II, William III, or William IV). Adjusting our framework would not be so hard. Doing so may allow us to describe our proper and continuing common-law role with greater legitimacy. And it may provide a more accurate prediction of results—it could prevent the lower courts and litigants from thinking that we may approve a duty that we would not, even under the current terminology.

*   *   *

No party in this case has requested that we reconsider the judicial role in expounding new duties, and I agree that the Court's opinion reaches the correct result under our precedents. In an appropriate case, however, I would welcome the Court's reexamination of how we approach the question of new tort duties, at least in highly regulated and very familiar contexts.

Evan A. Young
Justice

**OPINION DELIVERED:** April 22, 2022