# Supreme Court of Texas

No. 24-0055

Inwood National Bank and Inwood Bancshares, Inc.,

*Petitioners*,

v.

D. Kyle Fagin, Individually and as Trustee and Beneficiary of the
D. Kyle Fagin Qualified Subchapter S Trust,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**PER CURIAM**

A trust agreement provided that the grantor intended to transfer to the trust her shares of a bank's stock "[u]pon approval by" the bank. But before the bank gave that approval, the grantor changed her mind and decided against the transfer. The trust's beneficiary, who is the grantor's former husband, sued the bank for tortious interference with a contract—the trust agreement—and other claims. The trial court granted summary judgment for the bank, but the court of appeals reversed as to the tortious interference claim. ___ S.W.3d ___, 2023 WL 6547936, at *7-8 (Tex. App.—Dallas Oct. 9, 2023). We conclude that the

tortious interference claim fails as a matter of law because the trust agreement created no contractual right to the shares in the beneficiary's favor with which the bank could interfere. Accordingly, we reverse that part of the court of appeals' judgment and reinstate the trial court's take-nothing judgment.

## I. Background

During her marriage to Kyle Fagin, Christy Fagin owned over two million shares of Inwood Bancshares, Inc. common stock as her separate property. In 2015, the couple discussed creating new entities to hold Christy's shares, ostensibly for tax benefits and protection from creditors. Inwood National Bank (the issuer of the shares) informed Kyle that Inwood "require[d] prior notice and review of any anticipated change in ownership or transfer of stock." The terms of Inwood's shareholder agreement, which it required all shareholders (including Christy) to sign, bear this out. That agreement requires Inwood's approval before any share transfer and declares that "ANY ATTEMPTED TRANSFER OF SHARES NOT IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT SHALL BE NULL AND VOID."

Kyle retained an attorney, and Kyle and Christy ultimately decided to put Christy's Inwood shares into two trusts—one that named Kyle as sole beneficiary (the Kyle Trust) and one that named Christy as sole beneficiary. The Kyle Trust was governed by a trust agreement titled "D. Kyle Fagin Qualified Subchapter S Trust" (the KTA). The KTA designated Christy and Kyle as trustees of the Kyle Trust and named Kyle as the trust's sole beneficiary. It contemplated two

2

transfers into the trust's corpus. The KTA provides that Christy, as grantor, "hereby transfers and delivers to the Trustees the property described in Schedule A attached hereto . . . upon the express terms and conditions . . . hereinafter set forth." Schedule A, in turn, states:

> $100.00 cash is the initial property transferred by the Grantor.
>
> Upon approval by Inwood Bancshares, Inc., the Grantor intends to transfer <u>581,658.21</u> Shares of common stock of Inwood Bancshares, Inc., a Texas corporation[.]

The KTA also contains the following irrevocability clause:

> This Trust shall be irrevocable. The Grantor shall have no right or power, in whatever capacity and whether alone or in conjunction with others, to alter, amend, revoke, or terminate the Trust, or any of the terms of this Trust Agreement, in whole or in part, or to designate the persons who shall possess or enjoy the trust property or the income therefrom. By this instrument the Grantor intends to and does hereby relinquish absolutely and forever all possession and enjoyment of the trust property.

Kyle and Christy both signed the KTA in October 2015.

Several weeks later, Inwood informed Kyle's attorney of the steps required to transfer the Inwood shares. Christy and Kyle would need to sign a "Shareholder Consent to Subchapter S Election" and a "Shareholder Subscription Agreement." In addition, Christy would need to send Inwood her existing stock certificate, indorsed[1] for transfer, along with "her request for transfer and her transfer instructions."

---

[1] Inwood's email used the word "endorsed," which is an alternate spelling for "indorsed." *See Indorse*, BLACK'S LAW DICTIONARY (12th ed. 2024). For this opinion, we use the spelling adopted in the Business and Commerce Code.

Inwood advised that, once these steps were completed, it would "(i) sign and date the documents requiring its signature, (ii) cancel the endorsed Certificate, and (iii) issue the new Certificate[] in the name of [the Kyle Trust]."

Christy and Kyle signed the two documents as requested, but Christy could not find her stock certificate. She therefore had to sign and notarize an "Affidavit of Facts Regarding Lost Share Certificates," which was delivered to Inwood in February 2016. Inwood then issued a replacement stock certificate in Christy's name only. Shortly thereafter, Inwood's attorney informed Kyle's attorney that he would "complete the transfer[] next week."

But Inwood never completed the transfer. According to Christy, she decided to revoke her consent to the proposed transfer in March 2016 after realizing that transferring her Inwood shares into the Kyle Trust would make those shares Kyle's separate property by gift, which she could never get back. Christy did not deliver her replacement stock certificate to Inwood. Instead, she asked Inwood not to proceed with the transfer, and Inwood did not countersign the agreement she and Kyle had signed.

## II. Procedural History

Kyle, individually and as trustee and beneficiary of the Kyle Trust, sued Inwood. Kyle alleged that Christy "irrevocably granted" the Inwood shares to the Kyle Trust when he and Christy signed the KTA, and he sought a declaration that the Kyle Trust owns the Inwood shares. Kyle later added a claim for tortious interference, alleging that Inwood "intentionally interfered with the [KTA]" by convincing Christy to

4

"revoke her transfer" of the Inwood shares to the Kyle Trust. Christy intervened, contesting Kyle's claim of ownership and asserting that the Inwood shares remain her separate property. After Christy intervened, Kyle amended his petition to assert several claims against Christy.

Kyle moved for traditional summary judgment on his breach of contract and declaratory judgment claims against Inwood and Christy, arguing that the evidence conclusively established that he owned the shares and Inwood failed to transfer them to the Kyle Trust. Kyle described the KTA as "an enforceable and irrevocable agreement to transfer" the Inwood shares to the Kyle Trust, and he asserted that Christy "irrevocably gifted and transferred" those shares to him when she signed the KTA in October 2015.

Inwood moved for traditional and no-evidence summary judgment on all Kyle's claims. As relevant here, Inwood argued that the KTA did not transfer ownership of the Inwood shares to the Kyle Trust because, when the KTA was executed, "there was absolutely no intention by [Kyle or Christy] to transfer [the Inwood shares] *at that time*. Schedule A expressly states that on the date of execution, the parties only agreed that there would be a stock transfer *at some future date . . . .*" Inwood contended that the KTA's terms required Inwood's "approval" to transfer the shares, which established that such approval had not been given when the KTA was signed.

With respect to Kyle's tortious interference claim, Inwood argued that the information Christy allegedly received from Inwood—that a transfer to the Kyle Trust would constitute an irrevocable gift of the shares to Kyle—could not give rise to a tortious interference claim

5

because it is "truthful information." The trial court granted Inwood's summary judgment motion (as well as Christy's[2]) without specifying the grounds and ordered that Kyle take nothing on his claims. After judgment was rendered, Kyle and Christy settled, and Kyle appealed only as to his claims against Inwood.

The court of appeals affirmed on all claims except tortious interference. In reversing the summary judgment on that claim, the court reasoned that the Texas Supreme Court had not recognized truth as an affirmative defense to tortious interference with an existing contract, so neither it nor the trial court could "legitimately recognize, in the first instance," that defense. 2023 WL 6547936, at *7. Inwood petitioned this Court for review.

## III. Relevant Law

### A. Standard of Review

We review summary judgments de novo. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017). When the trial court "does not specify the grounds it relied upon in making its determination, reviewing courts must affirm summary judgment if any of the grounds asserted are meritorious." *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

---

[2] As relevant here, Christy argued that she was entitled to summary judgment on Kyle's breach of contract claim because her alleged promise to transfer the Inwood shares was unsupported by consideration, so she was not contractually obligated to give Kyle any property that she had not already unconditionally and unequivocally delivered as a gift. Similarly, Christy argued that she was entitled to summary judgment on Kyle's declaratory judgment claim because she never made a completed gift of the shares to Kyle and she did not intend to give Kyle the Inwood shares when she signed the KTA.

Traditional summary judgment is proper if there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Lightning Oil*, 520 S.W.3d at 45. When reviewing summary judgment motions, we review the evidence "in the light most favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts against the motion." *Lightning Oil*, 520 S.W.3d at 45.

Courts ordinarily rule only on the grounds expressly presented in the summary judgment motion. *See* TEX. R. CIV. P. 166a(c). Yet we have said that, while "a trial court errs in granting a summary judgment on a cause of action not expressly presented by written motion, . . . the error is harmless when the omitted cause of action is precluded as a matter of law by other grounds raised in the case." *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297-98 (Tex. 2011); *see also, e.g.*, *Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 312 (Tex. 2019) (holding trial court's grant of summary judgment on an unaddressed claim was harmless error when the ground on which summary judgment was sought "applie[d] equally" to the unaddressed claim); *Withrow v. State Farm Lloyds*, 990 S.W.2d 432, 437-38 (Tex. App.—Texarkana 1999, pet. denied) (holding that reversal would be meaningless because the claim not specifically addressed in the summary judgment motion was precluded as a matter of law).

**B. Tortious Interference with an Existing Contract**

The elements of a claim for tortious interference with an existing contract are "(1) the existence of a contract subject to interference;

(2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred." *Rincones*, 520 S.W.3d at 588. With respect to the first element—the existence of a contract subject to interference—a party cannot recover for tortious interference unless it possesses "legal rights under the . . . contract" with which the defendant could have interfered. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998); *see N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 604-05 (Tex. 2016) (concluding that the defendant was not liable for tortious interference with an option agreement for land when the plaintiff had no contractual right to the land); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987) (noting a tortious interference claim requires proof that the claimant had a "specific contract right[]" subject to interference); *Anderson v. Archer*, 490 S.W.3d 175, 179 (Tex. App.—Austin 2016) (explaining that a successful claim for tortious interference with an existing contract "requires evidence of an enforceable contract right"), *aff'd*, 556 S.W.3d 228 (Tex. 2018). If the evidence does not support a finding that the defendant interfered with the plaintiff's "legal rights under [an] existing agreement," then the plaintiff's "tortious-interference claim must fail." *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 422 (Tex. 2017). In addition, we have said that "inducing a contract obligor to do what it has a right to do is not actionable interference." *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

## C. Contracts

If a written instrument is unambiguous, "we can determine the parties' rights and obligations under the agreement as a matter of law." *Id.* "In doing so, we look not for the parties' actual intent but for their intent as expressed in the written document." *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 744 (Tex. 2020); *see Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). These same principles of construction apply to a trust agreement—when no ambiguity exists, "[c]onstruction of a trust instrument is a question of law for the trial court." *Nowlin v. Frost Nat'l Bank*, 908 S.W.2d 283, 286 (Tex. App.—Houston [1st Dist.] 1995, no writ); *see Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex. App.—Fort Worth 2003, pet. denied). Whether a contract or other written instrument is ambiguous is a question of law for the court. *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022).

## D. Inter vivos trusts

A party can transfer property through an inter vivos trust. *Sarah v. Primarily Primates, Inc.*, 255 S.W.3d 132, 145 (Tex. App.—San Antonio 2008, pet. denied). One way to create an express trust is by "a property owner's inter vivos transfer of the property to another person as trustee for the transferor or a third person." TEX. PROP. CODE § 112.001(2). The trustee holds legal title to the trust property, and the beneficiary holds equitable or beneficial title. *See Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, N.A.*, 748 S.W.2d 218, 220 (Tex. 1988). We aim to "enforce the settlor's intent as expressed in an unambiguous trust over the objections of beneficiaries that disagree with a trust's terms." *Rachal v. Reitz*, 403 S.W.3d 840, 844 (Tex. 2013).

The grantor can make the transfer of property to an inter vivos trust subject to a condition precedent that must occur before the transfer is effective. *See Blardone's Est. v. McConnico*, 608 S.W.2d 618, 618 (Tex. 1980).

### E. Requirements of common-law gift and transfer of securities

To constitute an effective inter vivos gift under the common law, we have said that "there must be a delivery of possession of the subject matter of the gift by the donor to the donee, and a purpose on the part of the donor to vest in the donee, unconditionally and immediately, the ownership of the property delivered." *Wells v. Sansing*, 245 S.W.2d 964, 965 (Tex. 1952); *see Maldonado v. Maldonado*, 556 S.W.3d 407, 414-15 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("To establish the existence of a gift, the party must prove: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property."). The burden of proving an effective gift is on the alleged recipient. *Maldonado*, 556 S.W.3d at 415. Importantly, we have said that "[a] gift cannot be made to take effect in the future." *Fleck v. Baldwin*, 172 S.W.2d 975, 978 (Tex. 1943). Rather, to make a valid gift, "the donor must, *at the time [she] makes it*, intend an immediate divestiture of the rights of ownership out of [herself] and a consequent immediate vesting of such rights in the donee." *In re Est. of Wright*, 482 S.W.3d 650, 657 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (emphasis added); *see Walker v. Walker*, No. 14-16-00357-CV, 2017 WL 1181359, at *5 (Tex. App.—Houston [14th Dist.] Mar. 30, 2017, no pet.) ("Statements to the effect that a donor is 'going to give,' or will give the gift at some later date, do not show an intent to make a present gift.").

10

The Texas Business and Commerce Code also addresses certain requirements for effecting a transfer of securities. Section 8.104(a)(1) provides that "[a] person acquires a security or an interest therein" if "the person is a purchaser to whom a security is delivered." TEX. BUS. & COM. CODE § 8.104(a)(1). A "purchaser" takes by any "voluntary transaction creating an interest in property," including by gift. *Id.* § 1.201(29), (30). A certificated security is "delivered," effectuating a transfer, when "the purchaser acquires possession of the security certificate" or when the certificate is indorsed and delivered to a securities intermediary. *Id.* § 8.301(a); *see id.* § 8.304 (describing indorsement).

## IV. Analysis

To recover on his claim for tortious interference with an existing contract, Kyle must establish that he possessed "legal rights" under the KTA with which Inwood interfered. *Associated Indem. Corp.*, 964 S.W.2d at 288. He argues that, by signing the KTA, Christy "irrevocably gifted [the Inwood shares] to" him. Inwood argued in its summary judgment motion that the KTA unambiguously establishes that Christy had no present intent to transfer the shares upon signing but rather expressed an intent to transfer the shares at some future date, and only if approved by Inwood. We agree with Inwood.

The KTA's granting clause provides that Christy "hereby transfers and delivers" to the Kyle Trust "the property described in Schedule A attached hereto . . . upon the express terms and conditions . . . hereinafter set forth." Schedule A contemplates two transfers to the Kyle Trust. First, it states that "$100.00 cash is the

11

*initial property transferred* by [Christy]." (Emphasis added.) Next, it provides that "[u]pon approval by [Inwood], [Christy] *intends to transfer* 581,658.21 Shares of [Inwood] common stock." (Emphasis added.) The text—in particular, the different verb tenses used to describe each transfer—demonstrates that the KTA operated to *immediately* transfer $100 to the Kyle Trust, while the share transfer would take effect in the future, and only if approved by Inwood. Similarly, describing only the $100 as the "initial property" indicates that the $100 would be transferred first and the Inwood shares would be transferred at a later time if Inwood approved.

This distinction compels the conclusion that the KTA did not effect a transfer of the Inwood shares to the Kyle Trust. In contrast to Christy's unconditional transfer of the initial trust property of $100, the KTA unambiguously expressed Christy's intent to condition her transfer of the Inwood shares on Inwood's approval. Because that condition was never satisfied, the shares were never transferred to the Kyle Trust. *See Blardone's Est.*, 608 S.W.2d at 618.

Nor can Kyle claim that he or the Kyle Trust acquired the Inwood shares by gift. The KTA's plain language contemplates only a future intention to transfer the shares, not a present gift. *See Fleck*, 172 S.W.2d at 978 ("A gift cannot be made to take effect in the future . . . ."); *see, e.g.*, *Walker*, 2017 WL 1181359, at *6 (finding no present gift because statements from alleged donor to donee that "he *would* give him the property (as opposed to he *immediately* gives) and that he *would* transfer the property" in the future "are not statements of an immediate gift but rather reflect an intent to give the [property] at some point in

12

the future"); *Flores v. Flores*, 225 S.W.3d 651, 657 (Tex. App.—El Paso 2006, pet. denied) (finding no present gift when parents offered to give property to their son when he finished his enlistment in the military because "the evidence showed at most an intent to make a gift at some future date"); *Thompson v. Dart*, 746 S.W.2d 821, 826-27 (Tex. App.— San Antonio 1988, no writ) (finding no present gift when alleged donor merely stated that she "was going to give" the property at some future date). As the share transfer was contemplated to take effect in the future and conditioned on Inwood's approval, it lacks the "immediate[] and unconditional[]" characteristics of a valid gift. *Fleck*, 172 S.W.2d at 978; *cf. Powell v. Powell*, 822 S.W.2d 181, 183 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (finding effective gift of stock where the certificate conveying the shares was signed by the donor and "it 'sells, assigns, and transfers unto [the donee]' the shares without any conditions stated" and the donee possessed stock certificates in her name, signed and delivered by the donor).

Kyle contends that the KTA transferred title of the shares to him under the common-law rule that "parties can transfer securities without observing [Section 8.104] formalities if they clearly intend that the transfer take place." *Dutcher v. Dutcher-Phipps Crane & Rigging, Inc.*, 510 S.W.3d 592, 598 (Tex. App.—El Paso 2016, pet. denied). In support of this argument, Kyle cites *Dutcher* for this proposition:

> As between transferor and transferee, it seems to be the rule that transfer of title may take place though there is no delivery of the certificates themselves, nor endorsement of them, nor transfer of them on the books of the corporation, and even though the sale be by parol. In each case the inquiry is [1] *whether the minds of transferor and transferee*

> *met*, [2] *whether there was an intention that the stock should then and there be vested in the transferee*, and [3] *whether there were acts in the nature of a symbolical delivery of the property*.

*Id.* at 596 (emphases added) (quoting *Greenspun v. Greenspun*, 194 S.W.2d 134, 137 (Tex. App.—Fort Worth), *aff'd*, 198 S.W.2d 82 (Tex. 1946)). Kyle argues that all three requirements have been met via Christy's signatures on the KTA. We disagree.

The case on which *Dutcher* relies, *Greenspun*, was decided before the enactment of Business and Commerce Code Section 8.104. Regardless, neither *Dutcher* nor *Greenspun* can alter Section 8.104's unambiguous requirements, which Kyle concedes were not met in this case. *See* TEX. BUS. & COM. CODE § 8.104(a). If anything, one could argue (as Inwood did in the trial court) that the passage of Section 8.104(a) made it the exclusive mechanism by which parties may transfer securities, to the exclusion of the common-law principles governing gifts. But we need not and do not reach that question today because Kyle cannot succeed under either the common law or Section 8.104(a).

Because the KTA did not immediately and unconditionally vest Kyle with any "legal rights" to retain the shares under either the common law or Section 8.104(a), his claim that Inwood tortiously interfered with his rights to the shares under the KTA must fail. *Associated Indem. Corp.*, 964 S.W.2d at 288; *see El Paso Healthcare Sys.*, 518 S.W.3d at 421-22; *N. Shore Energy*, 501 S.W.3d at 605; *Hurlbut*, 749 S.W.2d at 767; *see also Stroud Prod., L.L.C. v. Hosford*, 405 S.W.3d 794, 812 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding that

parties asserting a tortious interference claim over rights to receive overriding royalty interests could not recover because they were "not legally entitled to" those royalties).[3]

Kyle argues that even if a transfer was not effected upon Christy's signing the KTA, the KTA's irrevocability clause operates to render her intended transfer of the shares an irrevocable gift to the Kyle Trust. We disagree. The irrevocability clause provides that "[b]y this instrument [Christy] intends to and does hereby relinquish absolutely and forever all possession and enjoyment of the trust property." But whereas the KTA immediately transferred $100 to the Kyle Trust, making that "trust property," the KTA's terms provide that the Inwood shares would not become trust property unless and until they were later transferred "[u]pon approval by" Inwood. Nothing in this irrevocability clause diminished Christy's power to decide against transferring the Inwood shares before they actually were transferred. As Christy retained the right not to transfer the shares up until the transfer was effected, Inwood cannot be liable for tortious interference because, even assuming Inwood suggested to Christy that she should not approve the transfer, "merely inducing a contract obligor to do what it has a right to do is not actionable interference." *ACS Invs.*, 943 S.W.2d at 430.

Our conclusion would not change if we viewed the KTA as a bilateral contract rather than a gift. As we explained, the Inwood shares

---

[3] Our conclusion is further buttressed by Kyle's failure to appeal the trial court's grant of summary judgment in favor of Inwood and Christy on Kyle's claim seeking a declaration that he owns the shares. 2023 WL 6547936, at *3. This failure waives any challenges associated with Christy's present ownership of the Inwood shares.

15

would not become trust property unless and until Inwood approved the transfer. Indeed, Christy was contractually prohibited via the shareholder agreement from consummating the transfer without Inwood's approval. *See Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 270 (Tex. 2021) (explaining that "an obligation to perform an existing agreement" can be subject to a condition precedent (quoting *Dillon v. Lintz*, 582 S.W.2d 394, 395 (Tex. 1979))); *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987) (concluding that the phrase "15 days after sight and upon approval of title" imposed a condition precedent to the formation of the contract and, therefore, "title does not pass . . . until fulfillment of such conditions"); *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976) (explaining that a condition precedent can relate to formation of a contract or liability under it and providing that "[c]onditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance").

We conclude that Kyle acquired no contractual right to the Inwood shares because Inwood never approved their transfer. The sole evidence Kyle references to support his contention that Inwood approved the transfer is an email from Inwood's attorney indicating that he "will complete the transfer[] next week." But this is insufficient to create a fact issue. Indeed, it demonstrates that Inwood had not given its approval when Christy and Kyle signed the KTA because the email was sent months after the KTA's execution. The summary judgment evidence demonstrates that Christy never delivered her certificate for

16

transfer to Inwood. It is further undisputed that Inwood did not countersign the shareholder subscription agreement authorizing the transfer. As Inwood did not approve, Christy's obligation to transfer did not arise, and Kyle never acquired a contractual right to the Inwood shares.

Kyle's failure to demonstrate a "specific contract right[]" to the Inwood shares means that his tortious interference claim must fail. *Hurlbut*, 749 S.W.2d at 767.[4] Though Inwood did not specifically assert this absence of a contractual right in the portion of its summary judgment motion addressing Kyle's tortious interference claim, any alleged error in granting summary judgment on that claim would be harmless because Inwood otherwise moved for summary judgment based on Kyle's lack of a contractual right to the shares, so the grounds asserted elsewhere in Inwood's summary judgment motion "appl[y] equally" to the tortious interference claim. *Endeavor Energy Res.*, 593 S.W.3d at 312.

## V. Conclusion

Accordingly, without hearing oral argument, the Court grants Inwood's petition for review, reverses the court of appeals' judgment in part, and reinstates the trial court's judgment that Kyle take nothing. *See* TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** January 31, 2025

---

[4] Because we conclude that Inwood was entitled to summary judgment on the tortious interference claim, we need not and do not decide whether providing truthful information operates as an independent affirmative defense to a claim for tortious interference with a contract.

17